**Walter MOSLEY, Jr., Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 06–02–00121–CR.**

Court of Appeals of Texas, Texarkana.

Submitted July 1, 2004.

Decided July 30, 2004.

Discretionary Review Refused Oct. 27, 2004.

*biguous Waiver of Immunity?"* 35 St. Mary's L.J. 275, 289–300 (2004).

Kyle B. Johnson, Houston, for appellant.

Nicole Habersang, Asst. Dist. Atty., Texarkana, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice ROSS.

Walter Mosley, Jr., was found guilty by a jury of aggravated sexual assault on his three-year-old step-granddaughter.[1] The jury assessed his punishment at twenty-six years' imprisonment.

Mosley appeals, contending (1) there was legally and factually insufficient evidence to support his conviction; (2) his trial counsel's errors and omissions constituted ineffective assistance of counsel; (3) the trial court erred in admitting hearsay statements by Mosley's wife; (4) the trial court erred in deferring to the trial judge—who had recused himself from the

---

1. We refer to the step-granddaughter by the pseudonym Jane Doe, which was used in the indictment.

case—in its ruling on his motion for continuance; and (5) it was an abuse of discretion to deny his motion to recuse the assigned judge from hearing his motion for new trial.

## I. LEGAL SUFFICIENCY OF EVIDENCE

Mosley contends the evidence supporting his conviction for aggravated sexual assault is legally insufficient because there was no evidence he penetrated Jane's sexual organ. A person commits aggravated sexual assault if that person intentionally or knowingly causes the penetration of the sexual organ of a child and the victim is younger than fourteen years of age. TEX. PEN.CODE ANN. § 22.021 (Vernon Supp. 2004). The indictment charged that Mosley, on or about November 2, 2000, intentionally or knowingly penetrated the female sexual organ of Jane, a child younger than fourteen years of age who was not his spouse, by inserting his finger into her female sexual organ.

In our review of the legal sufficiency of the evidence, we employ the standards set forth in *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This calls on the court to view the relevant evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Johnson v. State,* 23 S.W.3d 1, 7 (Tex.Crim.App.2000). In our review, we must evaluate all of the evidence in the record, both direct and circumstantial, whether admissible or inadmissible. *Dewberry v. State,* 4 S.W.3d 735, 740 (Tex. Crim.App.1999). We consider all evidence presented at trial; however, we do not reweigh the evidence or substitute our judgment for that of the fact-finder. *King v. State,* 29 S.W.3d 556, 562 (Tex.Crim. App.2000). The jury is the sole judge of the credibility of witnesses and of the strength of the evidence. *Fuentes v. State,* 991 S.W.2d 267, 271 (Tex.Crim.App. 1999). Therefore, if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm. *McDuff v. State,* 939 S.W.2d 607, 614 (Tex.Crim.App.1997).

In this case, Christy McCoy, Jane's mother, testified as the outcry witness. She testified that Mosley is married to her mother and that Jane spent a lot of time at their house. She testified Jane referred to her mother as "Nana" and to Mosley as "Pawpaw." McCoy testified Mosley spent a lot of time playing with Jane and watching television with her in the bedroom. She also testified he bought her a lot of toys. On November 2, 2000, when Jane was three years old, she spent the night at the Mosleys' house. When she returned home the following evening, she was itching, scratching, and pulling at her panties, and she made a comment that her booty tickled. McCoy testified "booty" is what Jane calls her private area. That evening, while Jane and McCoy sat on the couch watching cartoons, Jane suddenly stood and whispered, "Do spiders ever get in your booty?" McCoy replied, "No, [Jane], why? Has a spider bit you on your booty?" Jane replied that one had, and pointed to her private area, as where the spider bit her. McCoy then asked Jane who had the spider, and she replied, "Pawpaw." McCoy asked Jane what she and Pawpaw were doing. She replied they were in the woods looking for wolves and the spider bit her. McCoy took Jane into the bedroom and discovered her private area was red and irritated. Jane then made the comment, "That spider just crawled in my belly and crawled out."

McCoy took Jane to the emergency room at Christus St. Michael Health System in Texarkana, where a physician and a

nurse performed a brief visual examination which, according to their testimony, revealed injuries consistent with sexual abuse. McCoy then took Jane to Arkansas Children's Hospital in Little Rock for a more thorough sexual assault examination.

McCoy testified that, before this time, she had been noticing unusual behavior in Jane. Jane was having nightmares; she also complained often of her private area hurting and itching. McCoy testified Jane would "mess with herself and then smell her fingers and ... laugh about it." McCoy testified that, since Jane stopped going to the Mosleys' house, she had not been acting out sexually or having nightmares.

Jane also testified at trial. At that time, she was five years old. She identified Mosley in the courtroom as her Pawpaw. The State produced an anatomically correct doll, and Jane testified she calls the part between the legs a "booty." Jane testified she was on the bed in her Nana's room when Pawpaw touched her booty with his hand. Jane demonstrated where Pawpaw touched her by pointing to the genital area of the doll. She testified that her Pawpaw hurt her when he touched her booty and that no one else had ever touched her or hurt her in that way. She testified she told her mother what happened shortly after it occurred. After she told her mother, she went to doctors, where they found "a little bite" inside her booty. She also testified no one told her to say her Pawpaw touched her booty.

The physicians who examined and treated Jane also testified. Jim Ed Brewer, M.D., a resident at Arkansas Children's Hospital, and Gerald Green, M.D., a pediatrician at the same hospital, conducted a sexual assault examination on Jane. Brewer testified Jane had a tear in her hymen and in her posterior fourchette. He testified these injuries were sustained through direct penetration of the vagina. Brewer further testified these tears were consistent with sexual abuse and digital penetration.

Green also testified Jane had two tears, one to the hymen and one to the posterior fourchette. He testified that these types of injuries have been researched extensively and that injuries like Jane suffered are believed to be exclusively caused by penetration. Green testified the types of tears Jane had were consistent with sexual abuse. He also concluded that, due to Jane's size and the degree of tearing, it was very unlikely the injuries were self-inflicted.

Matthew Young, M.D., a physician at Christus St. Michael Health System's emergency department in Texarkana, testified he did not do an extensive examination on Jane, but did observe redness and damage to Jane's skin that he thought could have been caused by sexual abuse. Brandi Ross, a registered nurse at St. Michael, testified she observed redness and a hymenal tear consistent with penetration.

Finally, Missy Ward, a child protective services specialist, testified regarding some of the signs or indicators of sexual abuse in children. She testified sexually abused children will often have nightmares or act out sexually by touching their genital areas.

Mosley points out that Jane never testified he penetrated her sexual organ and, according to him, her testimony denied that any penetration occurred at all. Jane testified that Mosley touched her on the outside of her clothes and that he did not move his hand when he touched her. She also testified that Pawpaw hurt her on the outside of her booty and that she had never been hurt on the inside of her booty. He contends that, without direct testimony

on penetration, there was legally insufficient evidence of his guilt to sustain a conviction.

■ In *Villalon v. State,* 791 S.W.2d 130, 133–34 (Tex.Crim.App.1990), the Texas Court of Criminal Appeals held there is no requirement a child victim be able to testify as to penetration. Penetration, like other essential elements of an offense, may be proven by circumstantial evidence. *See id.* This rule reflects the important public policy that we cannot expect the child victims of violent crimes to testify with the same clarity and ability as is expected of mature and capable adults. *Id.* To expect such testimonial capabilities of children would be to condone, if not encourage, the searching out of children to be the victims of crimes, such as the instant offense, in order to evade successful prosecution. *Id.*

Relying on these principles, we find the evidence sufficient to establish penetration. While Jane did testify that Mosley only touched her on the outside of her clothes and that it only hurt on the outside of her booty, other portions of her testimony, along with the outcry witness and the medical testimony, were legally sufficient to establish Mosley penetrated Jane's sexual organ. Jane testified that her Pawpaw touched her booty, that he hurt her when he touched her booty, and that no one else had ever touched her like that or hurt her in that manner. She testified she told her mother about the incident, and she took her to doctors, where they found "a little bite" inside her booty. Her mother, the outcry witness, testified Jane asked her, "Do spiders ever get *in* your booty?" (Emphasis added.) Jane also told her, "That spider just crawled *in* my belly and crawled out." (Emphasis added.) The medical testimony supports the conclusion that penetration occurred. Green and Brewer testified Jane had two tears, one in her hymen and one in her posterior four-

chette. Green, Brewer, and Ross all testified these injuries could only be the result of penetration and were consistent with sexual abuse. Even without direct testimony of penetration from the victim, the other evidence is legally sufficient for the jury to find beyond a reasonable doubt Mosley penetrated Jane's female sexual organ.

## II. FACTUAL SUFFICIENCY OF THE EVIDENCE

Mosley also contends the evidence is factually insufficient to support his conviction. When reviewing a challenge to the factual sufficiency of the evidence, we are required to determine whether, considering all the evidence in a neutral light, the jury was rationally justified in finding guilt beyond a reasonable doubt. *Zuniga v. State,* No. 539–02, 144 S.W.3d 477, 2004 WL 840786 (Tex.Crim.App. Apr.21, 2004). There are two ways in which we may find the evidence to be factually insufficient. First, if the evidence supporting the verdict, considered alone, is too weak to support the jury's finding of guilt beyond a reasonable doubt, then we must find the evidence insufficient. *Id.* Second, if—when we weigh the evidence supporting and contravening the conviction—we conclude that the contrary evidence is strong enough that the state could not have met its burden of proof, we must find the evidence insufficient. *Id.* "Stated another way, evidence supporting guilt can 'outweigh' the contrary proof and still be factually insufficient under a beyond-a-reasonable-doubt standard." *Id.* If the evidence is factually insufficient, then we must reverse the judgment and remand for a new trial. *Clewis v. State,* 922 S.W.2d 126, 135 (Tex.Crim.App.1996).

Mosley contends that, when all of the evidence is viewed in a neutral manner, the proof of guilt is so weak it undermines

confidence in the jury's determination. He points to evidence which he contends contravenes the conviction. He contends the injuries Jane suffered were not the result of penetration from sexual assault. The physician at St. Michael's emergency department testified Jane's injuries could have been caused by a straddle injury. McCoy testified that, before the incident in question, Jane was involved in an accident while riding a four-wheeler and another accident while riding a dirt bike. She said Jane had also ridden a horse.

Vernon Colton Shaffer, Jr., M.D., a gynecologist who testified as an expert witness for Mosley, testified he reviewed the medical records from Christus St. Michael's and Arkansas Children's hospitals and questioned whether Jane's injuries were actually tears at all. He testified there are several normal variations of anatomy that can occur in young girls. He testified a hymenal cleft can appear similar to a tear, and because the records showed there was no blood present at the time of examination, he questioned whether Jane's injuries were actually tears. He also opined that, if her injury was a tear, it could have been caused by a straddle injury. Based on his review of the medical records, he concluded that, because there was no bleeding, discharge, or redness, Jane's injuries could have occurred as a natural anatomical variation, or as an injury sustained in the normal course of childhood activities, such as horseback riding, horseplay, or an unrecognized straddle injury. Shaffer cited a study conducted on seventy-nine five-year-old nonabused girls, which revealed six girls with histories of straddle injuries. The most common finding among these girls was a defect in the posterior fourchette. The study also found that one in five girls had defects in their posterior fourchette as a normal finding, without abuse. Shaffer did concede, how-

ever, that Jane's injuries were consistent with sexual abuse and digital penetration.

Mosley also contends the medical testimony weighs against the injury occurring on November 2, the date Jane spent the night at the Mosleys. The next evening, she was taken to Christus St. Michael's and Arkansas Children's hospitals. Brewer testified that there was no blood or surrounding redness and that this indicated the injury was from two weeks to three to four months old. Green testified there was no bleeding, so he felt it was reasonable to conclude the injury had not occurred within hours or even the day of the examination. He felt the injuries could have been sustained days or weeks before. Shaffer opined the injuries were at best a week old.

Mosley suggests that this evidence establishes Jane did not sustain the tears during the overnight visit on November 2 with him and Jane's grandmother. McCoy testified, however, that Jane's behavior had been unusual for some time before her outcry and that Mosley spent a lot of time playing with her before November 2.

▪ Even if the evidence did not conclusively establish that the offense occurred November 2, 2000, the law is settled that, when a charging instrument alleges an offense occurred "on or about" a certain date, the state is not required to prove that the offense occurred on the specific date alleged, but only that the offense occurred before the presentment of the charging instrument and within the limitations period. *See Sledge v. State*, 953 S.W.2d 253, 256 (Tex.Crim.App.1997). Days or weeks before November 2, 2000, is before the State's petition was filed (March 20, 2002) and is within the applicable statute of limitations. *See* TEX.CODE CRIM. PROC. ANN. art. 12.01(5)(B) (Vernon Supp.2004) (stating statute of limitations for aggravated sexual assault is "ten years

from the 18th birthday of the victim of the offense").

Mosley also directs us to McCoy's testimony, where she admitted Jane had said more than once she was not telling the truth about the spider. Jane also testified she did not remember telling anyone a story about a spider. She did testify, however, that she never told anyone that what she said about her Pawpaw was untrue.

Mosley further complains the entire case against him was built around McCoy's loaded and leading question to her three-year-old child of, "[W]ho had the spider?" Mosley contends that, when McCoy asked Jane this question, it suggested to the child she should come up with a name. Mosley cites research that this type of loaded and leading question will often elicit incorrect answers, even in children much older than three years old. *See* DEBRA A. POOLE & MICHAEL E. LAMB, *Investigative Interviews of Children, A Guide for Helping Professionals* 53 (American Psychological Association 1998). Mosley, however, overstates the significance of this question in the allegations that were made against him. Jane did not remember the story about the spider at trial. What she did remember was that her Pawpaw touched her booty, and she related that to the jury several times.

Mosley contends that, when you consider the contravening evidence, there is insufficient evidence tying any type of penetration of Jane to him, or that penetration occurred at all. As previously discussed, there is ample evidence Mosley did penetrate Jane's sexual organ. The evidence establishes that Mosley touched Jane's sexual organ, that he hurt her when he did so, and that no one else had ever touched her or hurt her in that way. Her outcry statement suggests Mosley did penetrate her sexual organ, and there is testimony from three medical professionals that inju-

ry occurred consistent with sexual abuse involving penetration. The contravening evidence Mosley cites merely created a fact issue. This Court must defer to the jury's findings and may not substantially intrude on the fact-finder's role as the sole judge of the weight and credibility of the witnesses. *Cain v. State*, 958 S.W.2d 404, 408–09 (Tex.Crim.App.1997). The jury had the opportunity to hear Jane, McCoy, and the conflicting medical testimony. It was able to observe the demeanor of the witnesses and judge their credibility. Weighing all the evidence in a neutral light, both in support of and against the finding, the jury was rationally justified in finding guilt beyond a reasonable doubt.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Mosley contends his trial counsel rendered ineffective assistance by committing numerous errors and omissions at trial. He contends each of these errors and omissions, standing alone, as well as their cumulative effect, raise a reasonable probability that, but for the unprofessional errors, the result of the proceeding would have been different.

Mosley had three attorneys representing him during trial. He cites the following five errors or omissions as establishing their ineffective assistance: (1) failure to object to the State's reference to "re-indictment"; (2) failure to object to the State's mischaracterization of evidence; (3) eliciting damaging testimony from the victim; (4) eliciting damaging testimony from Green that Jane's wounds could not have been self-inflicted; and (5) failure to address the issue of the loaded question.

■ The standard for testing claims of ineffective assistance of counsel is set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To

prevail, an appellant must prove by a preponderance of the evidence (1) that his or her counsel's representation fell below an objective standard of reasonableness, and (2) that the deficient performance prejudiced his or her defense. *Id.* at 686–87, 104 S.Ct. 2052; *Tong v. State,* 25 S.W.3d 707, 712 (Tex.Crim.App.2000); *Rosales v. State,* 4 S.W.3d 228, 231 (Tex.Crim.App. 1999). Under this standard, a claimant must prove that counsel's representation so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052.

We must begin with the strong presumption that counsel was competent. *See Thompson v. State,* 9 S.W.3d 808, 813 (Tex.Crim.App.1999). We presume counsel's actions and decisions were reasonably professional and were motivated by sound trial strategy. *Jackson v. State,* 877 S.W.2d 768, 771 (Tex.Crim.App.1994). An appellant has the burden of rebutting this presumption by presenting evidence that trial counsel's conduct fell outside the range of reasonable professional assistance. *Garcia v. State,* 57 S.W.3d 436, 440 (Tex.Crim.App.2001). An appellant cannot meet this burden if the record does not show the reasons for the conduct of trial counsel. *Kegler v. State,* 16 S.W.3d 908, 911–12 (Tex.App.-Houston [14th Dist.] 2000, pet. ref'd). This kind of record is best developed in a hearing on an application for writ of habeas corpus or a motion for new trial. *Id.* at 912. When the record is silent regarding the reasons for counsel's conduct, finding counsel ineffective would cause the court to engage in mere speculation. *Id.*

■ In the absence of direct evidence of counsel's reasons for the challenged conduct, an appellate court will assume a strategic motivation if any can be imagined.

*Garcia,* 57 S.W.3d at 440. We will not conclude the challenged conduct constitutes deficient performance unless the conduct was so outrageous no competent attorney would have engaged in it. *Id.; see Thompson,* 9 S.W.3d at 814.

*1. Counsel's failure to object to statement regarding re-indictment*

■ Mosley first cites his counsel's failure to object to the prosecutor's statement that he had been re-indicted for this offense. After the State's opening statement, the prosecutor stated, "Your Honor, before I [call my first witness] I would ask the Court to take judicial notice that the indictment in this case was originally returned on March 22 of 2001 and the re-indictment took place on March 20 of this year." The trial court responded, "The Court will so take judicial knowledge of it."

Mosley contends his re-indictment was not subject to judicial notice because it was not relevant to any ultimate issue in dispute. *See Watts v. State,* 99 S.W.3d 604, 610 (Tex.Crim.App.2003) (adjudicative facts which may be judicially noticed are facts which are relevant to ultimate issue in dispute, but are not themselves the subject of any controversy). He contends his trial counsel should have objected to the State's request for judicial notice as irrelevant and prejudicial, and asked for an instruction for the jury to disregard. He contends his trial counsel's failure to object was harmful because it gave the impression to the jury he had two charges for which he was indicted. He directs our attention to a note the jury sent to the court during its deliberations asking, "What was the outcome of the first indiment [sic] if this is the second," in support of his contention and as evidence of prejudice. The trial court's response to that note was: "There are not two indictments in this case. Second is a clarification of this one charge." While Mosley concedes

the trial court properly advised the jury, he contends the damage was already done because the evidence in the trial was viewed in the context of this being a second charge.

The State contends this request for judicial notice was not subject to a relevancy objection because it had to prove that the offense occurred before the presentment of the charging instrument and that the offense was within the statute of limitations. The issue of when the offense occurred was a contested issue at trial, but there was no issue as to the date the indictment was presented or whether it was within the statute of limitations. The request for judicial notice, therefore, was subject to a valid objection. The record is devoid, however, of any explanation for counsel's decision not to object to this request. Defense counsel could have determined that an objection would have unduly drawn the jury's attention to it. Based on this record, we cannot conclude defense counsel's conduct fell below an objective standard of reasonableness for failing to object. Counsel's failure to object was not so outrageous that no competent attorney would have failed to object. Further, the trial court's proper instruction in response to the jury's note—given before the verdict was returned—cured any prejudice from this statement. We presume the jury follows the trial court's instructions. *See Williams v. State*, 937 S.W.2d 479, 490 (Tex.Crim.App.1996). Mosley has failed to show how defense counsel's failure to object so prejudiced his defense as to render counsel ineffective.

*2. Failure to object to State's mischaracterization of evidence*

█ Mosley contends that the State mischaracterized the outcry witness' testimony and that his counsel's failure to object constituted ineffective assistance. During McCoy's testimony, the State asked, "around the time or prior to the time that [Jane] told you about Pawpaw putting a spider in her booty did you notice any unusual behavior in [Jane]?" Mosley contends this question mischaracterized the evidence in a way that suggested there was actual evidence of penetration from the victim's own statement.

As detailed in the discussions of legal and factual sufficiency above, Jane testified her Pawpaw touched her booty, he hurt her when he did so, and no one else had ever touched or hurt her in that manner. McCoy testified that Jane told her a spider bit her on her privates and that her Pawpaw had the spider. McCoy also testified Jane told her, "That spider just crawled in my belly and crawled out." Mosley contends the above question closed the gap in the evidence the State was missing, i.e., that Mosley was the one who "put the spider in Jane's booty," or sexually penetrated her sexual organ. Mosley also points out the State repeated this mischaracterization in its closing argument by saying, "[Jane] told her mother, Pawpaw put a spider in my booty and the spider crawled up inside and bit me."

While this is arguably a mischaracterization of the evidence, Mosley has failed to show that it fell below an objective standard of reasonableness. The record is devoid of any explanation for counsel's decision not to object to this statement, and counsel's decision to not object was reasonable. Before the question of which Mosley complains, the State asked McCoy, "Did she tell you what the spider felt like when it was inside?" Two of Mosley's attorneys objected, and the court overruled the objections. Defense counsel could have reasonably concluded that any further objections on that topic would also be overruled. Further, based on the evidence set forth above in the legal and factual sufficiency analysis, Mosley has failed to show how

counsel's failure to object so prejudiced his defense as to render counsel ineffective.

### 3. Eliciting damaging testimony from the victim on cross-examination

■ Mosley also contends his trial counsel was ineffective for eliciting damaging testimony from Jane on cross-examination. Mosley contends Jane never testified on direct examination that he hurt her or caused her pain. On cross-examination, however, his attorney elicited this testimony:

Q Has your pawpaw that you pointed out ever done anything to hurt you?

A Yes.

Q What?

A (Speaking very quietly) He touched my hiney.

Q Now you just sat there, and did you say he touched your hiney?

A I mean booty.

Mosley contends that, through this cross-examination, his own attorney elicited the only evidence that tied him to the victim's injuries. This misstates the evidence. When Jane was asked on direct examination how it felt when Mosley touched her booty, she answered, "Not good." There was also other evidence tying Mosley to Jane's injuries, including her testimony that her Pawpaw touched her booty and that no one else had ever touched her that way.

The record is also devoid of any explanation for counsel's decision to cross-examine Jane in this manner. It was certainly reasonable for trial counsel to pursue this line of questioning in light of the affection the victim showed for Mosley in her earlier testimony. Under these circumstances, it was not unreasonable for counsel to expect a favorable response to the question. Mosley has failed to satisfy the first prong of *Strickland*, that his counsel's representa-

tation fell below an objective standard of reasonableness.

### 4. Eliciting testimony from Green that Jane's wounds could not have been self-inflicted

■ Mosley again contends his counsel conducted an ill-advised cross-examination that elicited damaging testimony not previously brought out on direct examination. During McCoy's testimony, she described how Jane would "mess with herself in the tub." Mosley contends this clearly raised the possibility that Jane's injuries could have been self-inflicted, but defense counsel blindly threw away this argument during his cross-examination of Green. Counsel asked Green the direct question whether it was possible Jane's injuries were self-inflicted. He replied, "It is very unlikely that this was self inflicted," because of the degree of tearing.

Mosley fails to demonstrate it was unreasonable for his trial counsel to pursue this defensive strategy. The record is devoid of any explanation for counsel's decision to cross-examine Green as he did. It was not unreasonable for defense counsel to explore the possibility of alternative causes for Jane's injuries. To effectively raise the self-infliction defense with the jury, it would have to be established that it was at least possible. Defense counsel's attempt to establish its possibility was not unreasonable. Mosley has again failed to satisfy the first prong of *Strickland*, that his counsel's representation fell below an objective standard of reasonableness.

### 5. Failure to address "loaded question" issue

■ Mosley contends this case began on the basis of a loaded question: McCoy's question to her daughter, "[W]ho had the spider." Mosley contends this was a very loaded question and could easily have elicited an incorrect response. He contends

his counsel's failure to point this out to the jury deprived him of effective assistance.

Again, the record is devoid of any explanation for counsel's decision not to pursue this strategy. The record does reflect, however, that in the discussions Jane had with other people about the abuse, and in her trial testimony itself, she never named anyone other than Mosley as the perpetrator. It was not unreasonable for defense counsel, aware of Jane's consistency, to have considered and rejected this strategy.

### 6. Cumulative effect

Mosley contends the cumulative effect of defense counsel's errors and omissions seriously undermined confidence in the result of the trial. He contends defense counsel could have pursued or not pursued different avenues for his defense.

▮▮▮▮▮ A vague, inarticulate sense that counsel could have provided a better defense is not a legal basis for finding counsel constitutionally incompetent. *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim.App.2002). Further, Mosley has not shown his counsel's representation fell below an objective standard of reasonableness. The record is devoid of any explanation for counsel's reasons for pursuing or not pursuing different trial strategies. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *McFarland v. State*, 928 S.W.2d 482, 500 (Tex.Crim.App.1996). The record is silent regarding the reasons for counsel's conduct, and finding counsel ineffective would cause this Court to engage in mere speculation. *See Jackson*, 877 S.W.2d at 771. Based on this record, we cannot conclude Mosley established that his counsel's conduct fell below an objective standard of reasonableness. *See Thompson*, 9 S.W.3d at 814. Further, in light of the evidence reviewed under the legal and factual sufficiency analysis above,

Mosley has failed to show how counsel's actions so prejudiced his defense as to render counsel ineffective.

## IV. HEARSAY STATEMENT

▮▮▮ Mosley contends McCoy's testimony concerning a statement attributed to her mother was hearsay and should have been excluded. The testimony came during the following exchange:

Q Okay. After you took [Jane] to the bedroom, looked at her, saw that her private area was a little bit red, what did you do?

A I called my mother. I called my mother and told her what [Jane] had just told me and my mom was like—.

[Defense Counsel]: Your Honor, I would object to any testimony—.

THE COURT: I'm going to sustain.

[Defense Counsel]: That'd be hearsay.

[Prosecutor]: Your Honor, if I could, we're not offering it for the truth of the matter, sir. It was to show the state of mind.

[Defense Counsel]: We still object, Your Honor. That's—that has no indication of state of mind.

. . . .

[Prosecutor]: The evidence is going to be that she called to tell her mother what [Jane] told her and her response was, Well, I can't watch them all the time, which suggests that she knew they were alone together and she knew what was happening. It's not being offered for the truth of the matter, sir.

[Defense Counsel]: Judge, our client's wife's state of mind has nothing to do with this.

THE COURT: Well, no, it's not a state of mind.

[Prosecutor]: It's not hearsay. I'm not offering it for the truth of the matter asserted.

. . . .

THE COURT: I'm going to overrule the objection.

. . . .

Q . . . . So you called your mother and you told her what [Jane] just said to you. What was her response?

A Well, I can't watch them all the time.

Q Those were her exact words?

A Those are exact words.

The admission or exclusion of evidence is a matter within the discretion of the trial court. *Dixon v. State*, 940 S.W.2d 192, 197 (Tex.App.-San Antonio 1996, no pet.). We will reverse the trial court's determination only when its decision is "so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Cantu v. State*, 842 S.W.2d 667, 682 (Tex.Crim.App.1992).

Hearsay is defined by the Rules of Evidence as a statement, other than one made by the declarant while testifying at the trial, offered into evidence to prove the truth of the matter asserted. TEX.R. EVID. 801(d). "Matter asserted" includes any matter explicitly asserted, and any matter implied by a statement, if the probative value of the statement as offered flows from the declarant's belief as to the matter. TEX.R. EVID. 801(c). The State contends the statement, "Well, I can't watch them all the time," was not offered for the truth of the declarant's ability to watch Mosley and Jane all the time, and was, therefore, not hearsay. The State would be correct if we were applying federal rules. *See United States v. Ybarra*, 70 F.3d 362, 366 n. 1 (5th Cir.1995) (finding testimony that declarant said Ybarra would not come home as long as police were there was offered to prove Ybarra lived at house; therefore, statement was not offered to prove truth of matter asserted and, by definition, was not hearsay).

The Rules of Evidence on hearsay are much broader than the federal rules. Relevant to this case is the absence of a definition for "matter asserted" in the federal rules. In Texas, "truth of the matter asserted" includes any matter explicitly asserted, but also includes within hearsay any matter implied by a statement, if the probative value of the statement as offered flows from the declarant's belief as to the matter. *See* TEX.R. EVID. 801(c). Therefore, the implication of the out-of-court statement is a "matter asserted" and is inadmissible hearsay if the statement is offered for the implication. *See* 2 STEVEN GOODE ET AL., TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE § 801.2 (3d ed.2002) (discussing various categories of hearsay).

Similar testimony has been found to be hearsay. *See Drone v. State*, 906 S.W.2d 608, 611–12 (Tex.App.-Austin 1995, pet. ref'd) (finding testimony accused's girlfriend said, "I don't know why I washed those clothes for [the accused]. It felt like I killed the old woman myself," was hearsay); *see also O'Rear v. State*, 138 Tex. Crim. 327, 136 S.W.2d 214, 215 (1940) (during prosecution for possession of beer for sale in dry area, testimony of constable that area residents asked him to "clean up that mess out there" was inadmissible hearsay).

We hold that McCoy's testimony concerning her mother's statement was hearsay. Rule of Evidence 801(c) treats the implication of the out-of-court statement as a "matter asserted" and hearsay if offered for the implication. As illustrated by the State during trial, the statement was offered for the implication that McCoy's mother knew Mosley and Jane were alone

together and that she knew Jane was being sexually assaulted. This is an implied "matter asserted" under the Rules of Evidence and was, therefore, hearsay. The trial court erred in overruling Mosley's objection.

■■■■■ We now turn to a harm analysis. In our review of nonconstitutional error, we are to disregard errors, defects, irregularities, or variances that do not affect substantial rights of the accused. Tex.R.App. P. 44.2(b). A "substantial right" is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State,* 953 S.W.2d 266, 271 (Tex. Crim.App.1997). If, on the record as a whole, it appears the error "did not influence the jury, or had but a slight effect," we must conclude that the error was not harmful and allow the conviction to stand. *Johnson v. State,* 967 S.W.2d 410, 417 (Tex.Crim.App.1998).

■■■ For claims of nonconstitutional error, the Texas Court of Criminal Appeals has held that "a conviction should not be overturned unless, after examining the record as a whole, a court concludes that an error may have had 'substantial influence' on the outcome of the proceeding." *Burnett v. State,* 88 S.W.3d 633, 637 (Tex. Crim.App.2002). In other words, if we have "a grave doubt" the result was free from the substantial influence of the error, then we must reverse. *Id.* The court has explained that "grave doubt" means that, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.* at 637–38, *citing O'Neal v. McAninch,* 513 U.S. 432, 435–36, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). Thus, "in cases of grave doubt as to harmlessness the petitioner must win." *Burnett,* 88 S.W.3d at 638.

■■ As discussed above, there was ample evidence of Mosley's guilt, including the testimony from the victim, the outcry testimony, and the medical evidence. After examining the record as a whole, we find the error did not influence the jury, or had but a slight effect, and was therefore harmless.

## V. ORDER ON MOTION FOR CONTINUANCE

Mosley does not contend on appeal the trial court erred in denying his motion for continuance. He contends, instead, that the trial court's order denying his motion for continuance deferred to the recused judge's reasoning and rationale and was, in essence, a ruling by the recused judge. He contends that the order was therefore void and that the subsequent trial which naturally followed from this void order is itself a nullity. He asks this Court to reverse his conviction and remand the case to the point of the pending motion for continuance in order for it to be ruled on by an impartial judge.

The Honorable Bill Peek was the original trial judge in this case. Mosley filed a motion to recuse Judge Peek on the ground his impartiality might reasonably be questioned. Mosley cited Judge Peek's order shutting down his bail bond business for thirty days and the fact Judge Peek was listed as a witness by Bowie County in subsequent litigation stemming from that order.

■■■ A motion to recuse seeks to prevent a judge from hearing a case because of a nonconstitutional reason. Even if a motion to recuse is procedurally defective, the challenged judge must either grant the motion or refer the motion, so another judge can determine the merits of the motion to recuse. *See McLeod v. Harris,* 582 S.W.2d 772, 775 (Tex.1979); *Jamilah v. Bass,* 862 S.W.2d 201, 203 (Tex.App.-

Houston [14th Dist.] 1993, orig. proceeding). Here, Judge Peek properly referred the motion for recusal for hearing by another judge. The Honorable Paul Banner was appointed to hear the motion, which he denied after a hearing.

Mosley then hired Michael D. Peek, Judge Peek's son, to represent him. Judge Peek then voluntarily recused himself from Mosley's case. Under Rule of Civil Procedure 18b(2), judges must disqualify themselves from proceedings in which their impartiality might reasonably be questioned or, as in this case, where the judge's son or daughter becomes an attorney in the case. *See* Tex.R. Civ. P. 18b(2)(g) (judge shall recuse in any proceeding in which person within first degree of relationship to him or her is acting as lawyer in proceeding); *Dunn v. County of Dallas,* 794 S.W.2d 560, 562 (Tex.App.-Dallas 1990, no writ).[2] A party is not required to file a motion as a prerequisite to a judge disqualifying under this rule. *Dunn,* 794 S.W.2d at 562. After Judge Peek recused himself, the Honorable Leon F. Pesek, Sr., was assigned to the case.

On the first day of the trial, April 2, 2002, Mosley filed a motion for continuance, contending that his expert witness would not be able to attend the trial and that he was unable to find a replacement for this witness. He further averred that he was unable to procure the attendance of another witness, Mosley's daughter, who apparently resided in the state of Arkansas, that the State had agreed to continue the trial in this event, and that he relied on the State's agreement. This was Mosley's third motion for continuance. Judge Pesek denied the motion with the following language:

It was my feeling that when all of these motions for continuances [sic] set up, I had a discussion with Judge Peek concerning them and—yesterday, which was the 1st—and I knew these motions for continuances [sic] were coming, I felt it was in the best interest that we have a, that all of the attorneys and myself meet with Judge Peek since it's my feeling that a senior judge, one that is brought in to try a case—and in this particular case Judge Peek specifically asked me whether I was available for that week, that he wanted the case tried, to be disposed of. We met in Judge Peek's office and I felt it was, if a continuance was going to be granted in view of the past history over which I had no previous information or part of, that that call ought to be done by Judge Peek. While he expressed clearly that he has no interest in the outcome of this case, he was of the opinion that the case, based upon the prior record and assurances given him, that this case should go to trial in view of the fact of the State's preparing this case and getting the witnesses subpoenaed and everything at this last minute that it should go to trial. . . . And so based upon that, and I know it comes as no shock to the attorneys here this morning, that I'm going to deny the motion for continuance based upon our meeting yesterday, and I'm adopting the reasoning that Judge Peek has as my own, even though he has nothing and doesn't assert any interest in this case and has not in any way indicated to me one way the other [sic] what should happen in this case other than it needs to go to trail [sic].

Rule 18a requires that, if a judge recuses himself or herself, the judge "shall make no further orders and shall take no further action in the case except for good

---

2. The Texas Court of Criminal Appeals has adopted Tex.R. Civ. P. 18a for criminal cases.

*Arnold v. State,* 853 S.W.2d 543, 544 (Tex. Crim.App.1993).

cause stated in the order in which such action is taken." Tex.R. Civ. P. 18a(c). Once a judge is recused or disqualified from a case, the prudent approach is for the recused judge and the assigned judge to have no further communications with each other concerning any aspect of that case. Any such communication has, at the very least, the appearance of violating the basic policy reasons for the recusal in the first place. As the United States Supreme Court stated in its determination of whether a judge was constitutionally disqualified, "justice must satisfy the appearance of justice." *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955). This does not mean, however, that every such communication is a violation of Rule 18a.

▆▆▆▆ Rule 18a prevents a recused judge from making any further orders without good cause. The plain meaning of Rule 18a contemplates that "further action" can be taken only through an order of the court. Indeed, a court acts by and through its orders and not otherwise. *See Dunn,* 794 S.W.2d at 562; *City of Hurst v. City of Colleyville,* 501 S.W.2d 140, 143 (Tex.Civ.App.-Fort Worth 1973, writ ref'd n.r.e). Therefore, the issue for this Court to decide is whether Judge Peek made further orders in this case without stating good cause. Mosley contends Judge Peek's advice to Judge Pesek on the motion, and Judge Pesek's subsequent adoption of that advice, renders the order, in essence, one by Judge Peek.

▆▆▆▆ Judge Pesek's ruling indicates he and the attorneys in this case met in Judge Peek's office, where Judge Peek expressed his opinion that, based on the prior record and assurances given to him, the case should go to trial. This reported reference to "the prior record and assurances given him" obviously referred to events in the case and communications made to Judge Peek before his recusal. And, while it is not entirely clear what Judge Peek advised, it is clear he was not ordering the denial of the motion for continuance as a present act. *See Gen. Elec. Capital Auto Fin. Leasing Servs., Inc. v. Stanfield,* 71 S.W.3d 351, 354–55 (Tex.App.-Tyler 2001, no pet.) (factor in determination of whether letter is official order is language indicating present act); *Mixon v. Moye,* 860 S.W.2d 209, 210 (Tex.App.-Texarkana 1993, orig. proceeding) (finding letter by trial court did not constitute a judgment because it only indicated court's intention to render judgment in certain way and directed counsel to prepare an order).

It is also apparent from the record the parties and Judge Pesek did not construe Judge Peek's advice as an order. Although present at the time such alleged advice was given, Mosley's attorneys made no objection to such advice at the hearing on the motion for continuance. Nor did they object at that time to Judge Pesek conferring with Judge Peek on the matter. Both sides of the case made detailed arguments to Judge Pesek at that hearing on the propriety of the motion, and Judge Pesek then made his ruling in open court. Whatever the exact content of Judge Peek's communications to Judge Pesek and the attorneys, it is evident it was not an order as contemplated by Tex.R. Civ. P. 18a(c). Judge Peek did not violate the provisions of Rule 18a(c), and Judge Pesek's order on the motion for continuance was not void.

## VI. RECUSAL OF JUDGE PESEK FROM HEARING MOTION FOR NEW TRIAL

Mosley filed a motion for new trial based, in part, on the denial of his motion for continuance and Judge Peek's advice on the motion. At the same time, he filed a motion to recuse Judge Pesek from hear-

ing his motion for new trial. The Honorable Lanny Ramsay was assigned to hear the recusal motion. A hearing was conducted, and Judge Ramsay denied the motion.

Mosley contends it was an abuse of discretion for Judge Ramsay to deny his motion to recuse because Judge Pesek's impartiality was reasonably in question. Mosley does not contend Judge Pesek had some pervasive bias or partiality against him, only that Judge Pesek was biased on one particular ruling: the motion for new trial. Mosley contends Judge Pesek should not have been permitted to hear his motion for new trial because it was based, in part, on Judge Pesek's improper conduct in deferring his adjudicative responsibility to Judge Peek on the motion for continuance. Mosley also contends that, since Judge Pesek was biased against granting the motion for continuance due to outside influence from Judge Peek, a reasonable person, knowing all the circumstances, would suspect that Judge Pesek would be similarly motivated by these extrajudicial forces to deny a motion for new trial as well.

■■■■ A judge shall recuse himself or herself in any proceeding in which the judge's "impartiality might reasonably be questioned." TEX.R. CIV. P. 18b(2)(a). We review the denial of a motion to recuse for abuse of discretion. TEX.R. CIV. P. 18a(f); *Vickery v. Vickery,* 999 S.W.2d 342, 349 (Tex.1999) (op. on reh'g); *McElwee v. McElwee,* 911 S.W.2d 182, 185 (Tex.App.-Houston [1st Dist.] 1995, writ denied).[3] The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action; rather, it is a question of whether the court acted without reference to any guiding rules or principles. The mere fact that a trial court may decide a matter within its discretionary authority in a different manner than an appellate judge does not demonstrate such an abuse. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 242 (Tex.1985).

■■■■ We apply a reasonable person standard in determining whether a recusal motion should have been granted. *See Woodruff v. Wright,* 51 S.W.3d 727, 736 (Tex.App.-Texarkana 2001, pet. denied). The question is whether a reasonable member of the public at large, knowing all the facts in the public domain concerning the judge's conduct, would have a reasonable doubt the judge is actually impartial. *Rogers v. Bradley,* 909 S.W.2d 872, 881 (Tex.1995). The impartial standard of Rule 18b(2)(a) has been adopted in order that the public, i.e., the person on the street, might have confidence in the judiciary and to protect judges from unjustified complaints about their being partial in their decisions. *Id.* at 881–82.

The United States courts of appeals have had to analyze whether a trial judge should be disqualified when he or she receives advice or assistance from a biased or interested source. Although federal courts apply the federal disqualification rule contained in 28 U.S.C.A. § 455 (West 1993), that rule contains essentially the same language as Rule 18b.[4] Texas courts

---

3. In relevant part, the rule reads as follows:

 **(2) Recusal**
 A judge shall recuse himself in any proceeding in which:
 (a) his impartiality might reasonably be questioned;

 (b) he has a personal bias or prejudice concerning the subject matter or a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.
 TEX.R. CIV. P. 18b(2)(a), (b).

4. 28 U.S.C.A. § 455 (West 1993) provides in part: "(a) Any justice, judge, or magistrate

have looked to federal jurisprudence as an aid in these cases. *See Rogers,* 909 S.W.2d at 880; *Woodruff,* 51 S.W.3d at 736 n. 6.

In *Hall v. Small Bus. Admin.,* 695 F.2d 175 (5th Cir.1983), the losing party moved, after trial, to disqualify the judge and to vacate the judgment because it came to light the judge's law clerk had, among other things, accepted, before the judgment was rendered, an offer to join the law firm which represented the winning party. *Id.* at 178. The judge denied the motion on the ground the law clerk had never expressed an opinion to him about the winning party and because the law clerk had accepted the offer of employment only after the judge had made up his mind about the case and had written a rough draft of the opinion. *Id.*

On appeal to the Fifth Circuit, that court reversed and rendered an order disqualifying the judge. In reaching that decision, the court remarked that the goal of Section 455(a) "is to exact the appearance of impartiality" and therefore it was, in the court's opinion, immaterial "[w]hether or not the law clerk actually affected the judge's decision." *Id.* at 178–79.

In *Edgar v. K.L.,* 93 F.3d 256 (7th Cir. 1996), a district court judge appointed, with the parties' consent, a panel of experts. Although the parties were aware the panel had ex parte meetings with the judge from time to time to discuss administrative matters, the parties only discovered later that one of the meetings involved a discussion of the merits and possibly a preview of the panel's final report. *Id.* at 257–58. When the parties moved to disqualify the judge, he blocked discovery and denied the motion. *Id.* A petition for a writ of mandamus to the Seventh Circuit Court of Appeals followed. *Id.* at 257.

The Seventh Circuit issued a writ of mandamus disqualifying the judge. The court found the panel of experts appointed by the district court judge was not truly neutral because it had been influenced by submissions from advocacy groups and counsel supporting plaintiffs in other lawsuits against the defendant. *Id.* at 261–62. As to Section 455(a), the court held: "A thoughtful observer aware of all the facts ... would conclude that a preview of evidence by a panel of experts who had become partisans carries an unacceptable potential for compromising impartiality." *Id.* at 259–60 (citations omitted).

The *Edgar* court found the judge had received "personal knowledge" from the partisan experts, as opposed to knowledge gained in a judicial capacity. *Id.* at 260. The experts had advised the judge on conditions in Illinois state mental hospitals, which was the basis for the suit. *Id.* at 257. The court distinguished between "personal knowledge" and knowledge gained in a judicial capacity because information from the latter source enters the record and may be controverted or tested by the tools of the adversarial process. *Id.* at 259. Knowledge received in other ways, which can be neither accurately stated nor fully tested, is "extrajudicial." The court found that off-the-record discussions on substantive issues in chambers constitute "personal" or "extrajudicial" knowledge in the sense the information conveyed to the judge leaves no trace in the record and cannot "be controverted or tested by the tools of the adversary process." *Id.* The court found that mandatory disqualification under Sections 455(a) and 455(b)(1) followed. *Id.* at 259–60.

---

judge of the United States shall disqualify himself in any proceeding in which his impar-

tiality might reasonably be questioned."

Likewise, in *In re Kensington Int'l, Ltd.*, 368 F.3d 289 (3d Cir.2004), a federal district judge appointed five advisers to assist him in a complex bankruptcy case, which consisted of five consolidated asbestosis company bankruptcies. These advisers consisted of lawyers, retired state court judges, and professors with experience in asbestosis or mass tort litigation. *Id.* at 295–96. Several of the asbestosis companies involved in the bankruptcy moved to disqualify the judge on the ground that the advisers were interested in the litigation and the judge's reliance on them put his impartiality reasonably in question. *Id.* at 299. The court conducted a two-part inquiry. *Id.* at 303. First, determining whether the advisers had a conflict, and second, if there was a conflict, whether it might be perceived by the reasonably prudent person as having tainted the judge. *Id.*

The court noted two of the advisers represented claimants in another asbestosis-related bankruptcy case captioned *In re G–I Holdings Inc. Id.* at 299. The court found there was a substantial likelihood some of the future claimants in the G–I Holdings litigation would also have claims against one or more of the debtors in *In re Kensington. Id.* The court found the dual roles of the two advisers put them in a structural conflict of interest. *Id.* at 303.

The court then turned to the question of whether that conflict of interest by the two advisers irrevocably tainted the judge. The court examined both the *Hall* and *Edgar* decisions and found that the theme running through both those decisions is an almost irrebuttable presumption that a judge is "tainted" and must be disqualified where the judge surrounds himself or herself with individuals who may not be truly disinterested. *Id.* at 308. Given the unique level of access and influence the advisers had, the length of their appointment, and their conflicting dual roles, the court found that the reasonable person, with familiarity of the circumstances, would conclude that the advisers' conflict of interest tainted the judge. *Id.* at 309.

 In this case, Mosley does not contend Judge Peek's advice to Judge Pesek pervasively "tainted" his impartiality throughout the whole trial. Instead, he contends Judge Peek's advice "tainted" or biased Judge Pesek on the motion for continuance and the motion for new trial, which was based, in part, on the motion for continuance. We have already concluded that Judge Peek did not violate Rule 18a(c) and that Judge Pesek's order on the motion for continuance was not void. The question remaining is whether Judge Pesek conferring with Judge Peek concerning the motion for continuance tainted or biased him on the motion for new trial. We conclude it did not.

There are two important circumstances in this case that distinguish it from the federal cases discussed above. First, the meeting in Judge Peek's chambers was not ex parte and the knowledge gained by Judge Pesek from that meeting was not hidden from the parties. Unlike the circumstances in *Kensington, Edgar,* and *Hall,* here the attorneys for both sides were present and had an opportunity to hear whatever knowledge Judge Pesek obtained from Judge Peek. They therefore could have controverted or tested that information by the tools of the adversarial process at the hearing on the motion for continuance, which they did not do.

Second, unlike the circumstances in *Kensington, Edgar,* and *Hall,* where the alleged taint concerned substantive matters, Judge Pesek's meeting with Judge Peek in the present case concerned scheduling—an administrative matter—not an issue on the merits of the case. It is undisputed the only subject discussed in

that meeting concerned scheduling the case for trial and whether the pending motion for continuance should be granted. In ruling on the motion for continuance, Judge Pesek stated Judge Peek "expressed clearly that he has no interest in the outcome of this case," and again, that Judge Peek "doesn't assert any interest in this case and has not in any way indicated to me one way the other [sic] what should happen in this case other than it needs to go to trail [sic]." The truth of these statements was not challenged then, and is not challenged now.

We conclude a reasonable member of the public at large, knowing all the facts concerning Judge Pesek's conduct, would not have a reasonable doubt he was actually impartial in his consideration of Mosley's motion for new trial.

Even if Judge Ramsay erred in denying the motion to recuse Judge Pesek, we would be required to apply a harm analysis. Again turning to federal jurisprudence, the failure to recuse a judge because his or her "impartiality might reasonably be questioned" is subject to harm analysis. In *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988), the United States Supreme Court approved the vacatur of a final judgment entered by a district judge whose impartiality was reasonably in question. It explained, however, that this remedy would not be required in all such cases. It suggested that, in deciding whether to vacate such a final judgment, a court should "consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Id.* at 864, 108 S.Ct. 2194.

We find the Supreme Court's counsel on applying a harm analysis is appropriate in determining whether an assigned judge abused his or her discretion by denying a motion to recuse. We recognize, however, that such analysis is not undertaken in all recusal or disqualification circumstances. For instance, where a judge is constitutionally disqualified, such disqualification cannot be waived, even by agreement of the parties, and any orders or judgments rendered by a judge who is constitutionally disqualified are void and without effect. *Buckholts Indep. Sch. Dist. v. Glaser*, 632 S.W.2d 146, 148 (Tex. 1982). In addition, when a motion to recuse is filed, a trial court has only two options: recusal or referral of the case to the presiding judge for a determination as to its merits. Tex.R. Civ. P. 18a(c); *In re Rio Grande Valley Gas Co.*, 987 S.W.2d 167, 178–79 (Tex.App.-Corpus Christi 1999, orig. proceeding). This is true even when the motion may be considered untimely or as stating insufficient grounds for recusal. *Jamilah*, 862 S.W.2d at 203. Further, if a trial court fails to comply with the rules governing motions for recusal, all subsequent actions by the court in the case are void. *Brosseau v. Ranzau*, 28 S.W.3d 235, 238 (Tex.App.-Beaumont 2000, no pet.); *Rio Grande Valley Gas Co.*, 987 S.W.2d at 179. In contrast to these two circumstances, the erroneous denial of a recusal motion does not void or nullify the presiding judge's subsequent acts, and the parties to a proceeding may waive any ground for recusal after it has been fully disclosed on the record. Tex.R. Civ. P. 18b(5); *In re Union Pac. Res. Co.*, 969 S.W.2d 427, 428 (Tex.1998). A harmless error analysis in this context properly considers each of the two objectives of recusal: to provide the parties a fair trial (and appeal) and to promote confidence in the judicial system. *See Powell v. Anderson*, 660 N.W.2d 107, 121 (Minn.2003). And by using a risk

analysis, it allows the balancing of those objectives against the potential burdens placed on the judicial system and the parties by re-opening a final judgment.

■ Therefore, even if Judge Ramsay erred in denying the motion to recuse Judge Pesek, we would apply a harmless error analysis and examine: (1) the risk of injustice to the parties in the particular case; (2) the risk that denial of relief will produce injustice in other cases; and (3) the risk of undermining the public's confidence in the judicial process. *See Liljeberg,* 486 U.S. at 864, 108 S.Ct. 2194. Applying these standards, we conclude that any such error would be harmless.

*1. The risk of injustice to the parties in this particular case*

The risk of injustice to the parties in this case is slight. We have already noted that the meeting in Judge Peek's chambers was not ex parte, but was in the presence of all the attorneys, so that whatever information Judge Pesek learned from that meeting was subject to rebuttal. We have also discussed how that meeting concerned an administrative matter, not a substantive issue on the merits of the case.

Finally, the motion for continuance that was the underlying basis for Mosley's motion to recuse Judge Pesek was fatally defective and without merit. Articles 29.06 and 29.07 of the Texas Code of Criminal Procedure set forth the requirements for subsequent motions for continuance by the defense. Article 29.07 provides as follows:

Subsequent motions for continuance on the part of the defendant shall, in addition to the requisites in the preceding Article, state also:

1. That the testimony cannot be procured from any other source known to the defendant; and

2. That the defendant has reasonable expectation of procuring the same at the next term of the court.

Tex.Code Crim. Proc. Ann. art. 29.07 (Vernon 1989).

In addition to Article 29.07, subsequent motions for continuance must comply with the provisions of Article 29.06, which, in relevant part, provides as follows:

In the first motion by the defendant for a continuance, it shall be necessary, if the same be on account of the absence of a witness, to state:

1. The name of the witness and his residence, if known, or that his residence is not known.

2. The diligence which has been used to procure his attendance; and it shall not be considered sufficient diligence to have caused to be issued, or to have applied for, a subpoena, in cases where the law authorized an attachment to issue.

3. The facts which are expected to be proved by the witness, and it must appear to the court that they are material.

4. That the witness is not absent by the procurement or consent of the defendant.

5. That the motion is not made for delay.

6. That there is no reasonable expectation that attendance of the witness can be secured during the present term of court by a postponement of the trial to some future day of said term.

Tex.Code Crim. Proc. Ann. art. 29.06 (Vernon 1989).

■ The State points out that Mosley's motion for continuance failed to meet the requirements of Articles 29.06 and 29.07. The motion did not allege that the testimony could not be procured from any other source known to the defendant, as re-

quired by Article 29.07(1). The motion did not allege Mosley had a reasonable expectation of procuring the needed testimony at the next term of court, as specifically required by Article 29.07(2). *Salinas v. State,* 542 S.W.2d 864, 866 (Tex.Crim.App. 1976). The motion failed to state the facts which were expected to be proved by the witness, or that such facts were material. *See* TEX.CODE CRIM. PROC. ANN. art. 29.06(3). It failed to state the residence of the unavailable witness or that the residence was unknown. *See Gonzales v. State,* 505 S.W.2d 819, 821 (Tex.Crim.App.1974). Further, the motion did not state it was made for a reason other than delay. Failure to include these allegations renders the motion fatally defective and without merit. *See, e.g., Baker v. State,* 150 Tex. Crim. 191, 199 S.W.2d 1017, 1018 (1947); *Williams v. State,* 120 Tex.Crim. 288, 49 S.W.2d 772, 774 (1932); *Tucker v. State,* 109 S.W.3d 517, 520–21 (Tex.App.-Tyler 1999, pet. ref'd); *Branch v. State,* 774 S.W.2d 781, 787 (Tex.App.-El Paso 1989, pet. ref'd); *Casterline v. State,* 736 S.W.2d 207, 209–10 (Tex.App.-Corpus Christi 1987, pet. ref'd); *Campbell v. State,* 633 S.W.2d 592, 595 (Tex.App.-Amarillo 1982, pet. ref'd).

In addition, to establish that the trial court abused its discretion in denying a motion for continuance, a defendant must show he or she was actually prejudiced by the denial of the motion. *Vasquez v. State,* 67 S.W.3d 229, 240 (Tex.Crim.App.2002). Mosley has not set forth what his psychological expert would have testified to, how it was material to the case, or how he was prejudiced by the trial court's denial of his motion.

The motion for continuance was defective and without merit. It follows that the motion for new trial, to the extent it was based on the denial of the motion for continuance, was also without merit. Mosley does not contend Judge Pesek's ruling was incorrect on the merits or that another judge probably would have decided the motion for new trial differently. Therefore, any injustice in having Judge Pesek decide the motion for new trial was minimal.

*2. The risk that denial of relief will produce injustice in other cases*

With respect to the second factor, the United States Supreme Court concluded in *Liljeberg* that vacating the judgment would help prevent injustice in other cases "by encouraging a judge or litigant to more carefully examine possible grounds for disqualification and to promptly disclose them when discovered." *Liljeberg,* 486 U.S. at 868, 108 S.Ct. 2194. As noted above, the situation of this case was not one where any impropriety was hidden from the parties. The possibility that vacating the judgment would help prevent injustice in other cases is slight, at best.

*3. The risk of undermining public confidence in the judicial process*

The risk of undermining public confidence in the judicial process also weighs in favor of finding any error as harmless. Any appearance of impropriety from Judge Pesek relying on Judge Peek to help decide the motion for continuance is not present where the advice was contrary to his purported bias, i.e., for his son acting as defense counsel for Mosley.

## VII. CONCLUSION

We affirm the judgment.