NUMBER 13-07-00563-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 

 

MARIO ALBERTO ADAIR, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 36th District Court


of San Patricio County, Texas.


 


MEMORANDUM OPINION



Before Justices Rodriguez, Garza, and Vela


Memorandum Opinion by Justice Garza
 

 Appellant, Mario Alberto Adair, was charged by indictment with three counts of
indecency with a child, a second degree felony, and six counts of aggravated sexual
assault, a first degree felony. See Tex. Penal Code Ann. § 21.11(a)(1), (d) (Vernon 2003),
§ 22.021(a)(1)(B), (e) (Vernon Supp. 2007). A jury convicted appellant on all nine counts
contained in the indictment. Appellant elected for the trial court to assess his punishment. 
He was subsequently sentenced to forty years' imprisonment for aggravated sexual assault
and twenty years' imprisonment for indecency with a child. The trial court did not impose
any fines and ordered the sentences to run concurrently. By one issue, appellant argues
that the evidence adduced at trial was legally and factually insufficient to support his
conviction. We affirm.

I. Factual and Procedural Background


 On March 6, 2007, appellant was charged by indictment with three counts of
indecency with a child and six counts of aggravated sexual assault. See id. §§ 21.11(a)(1),
22.021(a)(1)(B). The jury trial commenced on August 13, 2007. At trial, the State called
five witnesses--B.A., the child victim, A.A., appellant's daughter, B.A.'s mother, Christian
Segura, a detective for the Yuma Police Department in Arizona, and Steve Hutchins, a
criminal investigator with the San Patricio County Sheriff's Office--while appellant did not
call any witnesses. (1) 

a. B.A's Testimony

 B.A. was fourteen years old at the time of trial and lived with her mother, sister, and
brother, M.A.A., in Yuma, Arizona. While her family was living in Yuma, her mother and
appellant got divorced. After the divorce, appellant moved to Ingleside, Texas. B.A. and
her siblings would visit appellant in Ingleside during the summer and during Christmas
breaks from school. The events in question transpired during a visit in the summer of
2005. While staying at appellant's house in Ingleside, she and her siblings would
occasionally sleep in appellant's room. When asked about the events in question, B.A.
testified to the following:

 Q [the State]: I want to talk to you about some of the time--or I guess
one time that you slept in your dad's bedroom.

 Right when you got back from Arizona to
Ingleside did your dad touch you inappropriately?

 

 A [B.A.]: Not as soon as we got there.

 

 Q: About how long was it from the time that you got there
until the time he did that?

 

 A: About a week later.

 

 Q: And where did this take place in the house?

 

 A: My dad's room.

 

 Q: Was this daytime or nighttime?

 

 A: Nighttime.

 

 Q: What did your dad do to you?

 

 A: He put his mouth on my private. He put his penis in my
butt, he put his fingers in my private, and he put his
mouth on my breast, and he put his fingers on my
breast.

 

 . . . .

 

 Q: By private[,] what are you talking about?

 

 A: My vagina.


B.A.'s brother and sister were in the room sleeping while the alleged offenses transpired.
The room was dark. Appellant and her brother usually slept on appellant's queen-sized
mattress while she and her sister slept on a mattress on the floor. B.A. was lying beside
her sister when the alleged offenses happened, but appellant kept moving her away from
her sister. B.A. testified that appellant sexually assaulted her again towards the end of the
summer of 2005. 

 When asked about her outcry statement, B.A. stated that she did not tell anyone in
Ingleside about the incidents because she was scared of getting hurt and ruining
everyone's lives. Eventually, on August 22, 2005, B.A. confided in her mother after
watching a movie on television about a girl who was molested and did not tell anyone
about it. After telling her mother about the incidents, B.A. was taken to the emergency
room. (2) 

 Later, B.A. met Detective Segura and gave him her statement at Amberly's Place. (3) 
Detective Segura then instructed B.A. to record telephone conversations with appellant in
order to "make him admit what he did." Detective Segura assisted B.A. with recording one
telephone conversation she had with appellant; however, appellant did not answer the
phone on this occasion. B.A. later spoke with appellant over the phone on three different
occasions, and she recorded each conversation. After making the recordings, B.A. turned
them over to Detective Segura. B.A. further testified that the voices on the recordings were
of her and appellant, and upon questioning by the State, B.A. indicated that she was not
married to appellant.

 On cross-examination, B.A. stated that she could not remember what she was
wearing on the nights that the incidents occurred. She also noted that the mattress on
which she and her sister slept was a regular mattress that was pulled off another bed in the
house and that she and her sister shared a blanket while sleeping on the mattress. B.A.
admitted that the reason the children were sleeping in appellant's room was because the
air conditioner in the house had stopped working. B.A. also admitted that appellant pulled
her shorts down and pulled her shirt up halfway rather than fully removing all of her clothing
while the alleged incidents took place. Finally, B.A. testified that when she recorded the
conversations with appellant, her mother was in the room.

b. Testimony of B.A.'s Mother

 After she and appellant separated in 2003, appellant moved back to Ingleside,
where the family had resided previously. The couple's divorce was finalized in 2004. The
couple agreed to a joint custody arrangement whereby appellant could come visit the
children any time he liked. The arrangement also allowed for the children to visit appellant
during the summer, Christmas, and sometimes spring break. During the summer of 2005,
the children visited appellant in Ingleside from May until August. After returning to Arizona,
B.A. called her while she was at work at approximately 8:00 p.m. on August 22, 2005, to
inform her of the alleged incidents that had transpired at appellant's home in Ingleside. 
After she received the phone call from B.A., she left work and took B.A. to the emergency
room. While at the hospital, B.A. spoke to several different police officers regarding the
incidents. Later, Detective Segura came over to her house to interview her regarding
B.A.'s allegations. Subsequently, B.A. was interviewed by police officers at Amberly's
Place. 

c. A.A.'s Testimony

 A.A. currently lives with her mother, B.A., and M.A.A. in Yuma, Arizona. When the
children would visit appellant during the summer and at Christmas, the children
occasionally slept in appellant's bedroom. A.A. would take the mattress from her bed and
place it in appellant's bedroom. The mattress had pillows and blankets on it, and she and
B.A. would sleep together on the mattress. They mostly slept in appellant's bedroom
because the home air conditioning unit was broken. However, A.A. stated that appellant
had purchased a "portable air condition thing that he put on his window" and that she
remembered it being used only during the summer of 2005. 

 With respect to the nights in question, A.A. recalled one night where she woke up
to find B.A. in appellant's bed. B.A. usually wore shorts and a t-shirt to bed while staying
at appellant's home. A.A. testified that she had heard the recorded conversations made
by B.A. and that the voices on the recording were that of B.A. and appellant.

 On cross-examination, A.A. admitted that her dog Mini, a Chihuahua, often slept on
the mattress with her and B.A. when they stayed at appellant's home. She did not recall
Mini sleeping anywhere other than on the mattress with her and B.A while they stayed at
appellant's home. 

d. Detective Segura's Testimony

 Detective Segura has worked for the Yuma Police Department for twenty years with
about 300 hours of training working "crimes against children." (4) Detective Segura has
worked in "[c]lose to if not over a thousand [child sexual abuse] cases." Detective Segura
described the interview process with the child victim and mentioned that during the course
of an investigation, he tries to obtain corroborative evidence--DNA evidence, actual
eyewitness accounts, or confrontational phone calls--to support the child victim's outcry
statement. Detective Segura described a confrontational phone call as "a call where the
victim makes a telephone call to the alleged person and then they basically get them to
admit to what happened." He stressed that he gives the child victim explicit instructions
regarding what to say when they are talking to the alleged perpetrator. He worked with
B.A. to develop a theme for talking to appellant about the incidents. Detective Segura
brought to court the microcassette recorder that B.A. had used to record her conversations
with appellant. Detective Segura testified that while speaking to B.A. at Amberly's Place
on August 25, 2005, she agreed to make a confrontational call to appellant. 

 B.A. made phone calls to appellant while Detective Segura was present, but no one
answered those calls. Detective Segura then allowed B.A. to take the microcassette
recorder home to record calls herself. Detective Segura received a phone call from B.A.'s
mother a couple of days later indicating that they had recorded three phone calls with
appellant. B.A. and her mother returned the microcassette recorder to Detective Segura
when he visited them later the same day.

 The State then offered to introduce the recordings of the confrontational calls into
evidence. Detective Segura testified that: (1) he had listened to the tape; (2) no changes
had been made to the tape since it was given to him by B.A. and her mother; and (3) the
recording to be heard was a copy he had made for the State from the original given to him
by B.A. and her mother. Appellant made no objections to the introduction of the
recordings.

e. The Recordings

 The State then introduced the recordings of the telephone conversations between
B.A. and appellant into evidence. The recordings contained the following exchanges which
are pertinent to our review:

 [B.A.]: I know what you have been doing to me in the night. I'm not
mad. I'm not going to tell any [sic] anyone or anything, but I
know.


 [Appellant:] Yeah, I'm listening.

 

 [B.A.]: And like [sic] touch me in the private part because I don't like
it.

 

 [Appellant]: (Inaudible).

 

 [B.A.]: So I want you to tell me you won't do it. Hello?

 

 [Appellant]: I'm--I'm listening.

 

 . . . .

 

 [B.A.]: Hey, dad, you know what we talked about?

 

 [Appellant]: Yeah.

 

 [B.A.]: I want you to like apologize.

 

 [Appellant]: Yeah, hum, you know, this is something we need to talk about
in person.

 

 [B.A.]: No, dad. I want you to apologize. I want--because, dad, I
really want you to apologize on the phone. Nobody is here.


 [Appellant]: Yeah, I apologize (inaudible). I apologize for (inaudible).


 [B.A.]: Like, promise. I want you to promise out loud.


 [Appellant]: I promise, I said it before (inaudible).


 [B.A.]: Why did you do it anyway?


 [Appellant]: Well, [B.A.], we can talk about this later on in person.


 [B.A.]: Because I have been having bad dreams because I watched
a movie.


 [Appellant]: Yeah?


 [B.A.]: And--yeah.


 [Appellant]: Yeah. Well, the thing about it is (inaudible). Well, like I said,
it's something we need to talk in person later on (inaudible)
probably about a year from now (inaudible).

 

 . . . .


 [Appellant]: (Inaudible). Yeah, you know, about what you were saying
earlier, I know you want some answers, need some answers
but it's something very personal that I think that, you know
(inaudible).


 . . . .


 [B.A.]: Dad, I don't want to see you if you're going to be touching my
private again.

 

 [Appellant]: What have I told you earlier, [B.A.]?

 

 [B.A.]: Oh, I don't know.

 

 [Appellant]: (Inaudible) I said it's over. It's over.

 

 [B.A.]: You should have planned (inaudible) and I wouldn't be having
to ask you all of these questions. It's not my fault it happened. 
It's yours.

 

 [Appellant]: Yeah.


 . . . .

 

 [B.A.]: No, dad. I'm just saying I don't want it to happen to any more
children because then you are going to get caught, and I don't
want you in jail. So I want you to say it on the phone. I want
you to say it [sic] I will never do it--I will never molest any other
children or me again. Say it, or I will be so mad at you. You
don't want--

 

 [Appellant]: I've already told you. I said no, no, no.

 

 [B.A.]: I want you to promise. I want you to say it. I want you to say
I promise I won't do it again.

 

 [Appellant]: I promise it will not happen again.


 . . . .

 

 [B.A.]: I mean, do you want to tell mom?

 

 [Appellant]: No. 


After the recordings were published to the jury, appellant objected, contending that the
recordings were never properly entered into evidence. However, the trial court denied his
objection.


 Appellant rested his case without calling any witnesses or presenting any evidence.
The jury subsequently convicted appellant on all nine counts contained in the indictment. 
On September 10, 2007, the trial court sentenced him to forty years' imprisonment in the
Texas Department of Criminal Justice-Institutional Division for the aggravated sexual
assault conviction. Appellant also received twenty years' confinement for the indecency
with a child conviction. The sentences were ordered to run concurrently. On September
10, 2007, appellant timely filed his notice of appeal. Also, on September 10, 2007, the trial
court certified appellant's right to appeal. This appeal ensued. 

II. Standard of Review


 In a legal sufficiency review, we view the evidence in the light most favorable to the
prosecution to determine whether any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307,
318-19 (1979); Watson v. State, 204 S.W.3d 404, 414-17 (Tex. Crim. App. 2006). The trier
of fact is the sole judge of the facts, the credibility of the witnesses, and the weight given
to testimony. See Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Jackson, 443
U.S. at 318-39; Beckham v. State, 29 S.W.3d 148, 151 (Tex. App.-Houston [14th Dist.]
2000, pet. ref'd). We do not reevaluate the weight and credibility of the evidence, whether
circumstantial or direct, nor do we substitute our own judgment for that of the trier of fact. 
Mosley v. State, 141 S.W.3d 816, 821 (Tex. App.-Texarkana 2004, pet. ref'd); Beckham,
29 S.W.3d at 151. Instead, we consider whether the jury reached a rational decision. 
Beckham, 29 S.W.3d at 151.

 In a legal sufficiency review, each fact need not point directly and independently to
the guilt of the appellant, as long as the cumulative force of all the incriminating
circumstances is sufficient to support the conviction. Hooper v. State, 214 S.W.3d 9, 13
(Tex. Crim. App. 2007) (citing Barnes v. State, 876 S.W.2d 316, 321 (Tex. Crim. App.
1994); Johnson v. State, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993); Alexander v. State,
740 S.W.2d 749, 758 (Tex. Crim. App. 1987)). Circumstantial evidence is as probative as
direct evidence in establishing the guilt of an actor; circumstantial evidence alone can be
sufficient to establish guilt. Guevara v. State, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). 
On appeal, both circumstantial and direct evidence cases are examined using the same
standard of review. Id.

 We measure the sufficiency of the evidence by the elements of the offense as
defined by the hypothetically correct jury charge. Malik v. State, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997); Adi v. State, 94 S.W.3d 124, 131 (Tex. App.-Corpus Christi 2002,
pet. ref'd). "Such a charge would accurately set out the law, would be authorized by the
indictment, and would not unnecessarily increase the State's burden of proof." Malik, 953
S.W.2d at 240. The elements for indecency with a child are: (1) appellant intentionally and
knowingly engaged in sexual contact with a child or caused the child to engage in sexual
contact; (5) (2) the child was younger than seventeen years old; and (3) the child was not
appellant's spouse. Tex. Penal Code Ann. § 21.11(a)(1). The elements for aggravated
sexual assault are appellant intentionally and knowingly: (1) caused the penetration of the
anus or sexual organ of a child by any means; or (2) caused the sexual organ of a child to
contact or penetrate appellant's mouth, anus, or sexual organ. Id. § 22.021(a)(1)(B). 

 In a factual sufficiency review, we review the evidence in a neutral light to determine
whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly
unjust. Watson, 204 S.W.3d at 414-15. After considering all of the evidence in the record
related to appellant's sufficiency challenge, we compare the evidence weighed by the jury
that tends to prove the elemental fact in dispute with the evidence that tends to disprove
it. Santellan v. State, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997) (en banc). This Court
will not reverse the jury's verdict unless we can say with some objective basis in the record
that the great weight and preponderance of the evidence contradicts the verdict. Watson,
204 S.W.3d at 415.

III. Analysis


 By his sole issue on appeal, appellant contends that the evidence adduced at trial
was legally and factually insufficient to support his convictions. We disagree.

 In arguing that the evidence is legally and factually insufficient, appellant states that
there was no physical evidence of sexual abuse, there was no corroborating testimony that
these incidents actually occurred, and the jury was moved by emotion; therefore, its verdict
is against the great weight and preponderance of the evidence. Appellant further argues
that the confrontational telephone calls made by B.A. do not contain an admission from
appellant that he sexually assaulted B.A and that the police and B.A. tried to entrap him. 
Appellant also questions the authenticity and credibility of the recording presented at trial. 

 We begin by noting that the testimony of a child victim alone is sufficient to support
a conviction for sexual abuse. See Tex. Code Crim. Proc. Ann. art. 38.07(a), (b)(1)
(Vernon 2005); see also Tear v. State, 74 S.W.3d 555, 560 (Tex. App.-Dallas 2002, pet.
ref'd); Empty v. State, 972 S.W.2d 194, 196 (Tex. App.-Dallas 1998, pet. ref'd); Ruiz v.
State, 891 S.W.2d 302, 304 (Tex. App.-San Antonio 1994, pet. ref'd); Karnes v. State, 873
S.W.2d 92, 96 (Tex. App.-Dallas 1994, no pet.) (noting that a child victim's testimony alone
is sufficient evidence of penetration to support a conviction for aggravated sexual assault);
Kimberlin v. State, 877 S.W.2d 828, 831 (Tex. App.-Fort Worth 1994, pet ref'd). 
Therefore, because B.A. testified as to both incidents of sexual abuse, her testimony would
be enough to support appellant's convictions without any corroboration.

 In any event, the evidence adduced at trial satisfies the elements of each of the
alleged criminal offenses. B.A. testified that appellant: (1) put his mouth on her vagina;
(2) put his penis in her butt; (3) put his fingers in her vagina; and (4) put his mouth and
fingers on her breasts. B.A. also testified that she was fourteen years old at the time she
gave her testimony, thus establishing that she was under seventeen years of age when the
incidents occurred. In addition, B.A. stated that she was not appellant's spouse. 
Moreover, after conducting several interviews with B.A. at her home and at Amberly's
Place, Detective Segura, a detective who had worked on approximately 1,000 child sexual
abuse cases, also concluded that B.A. had been sexually assaulted. A.A. testified that
appellant had an air conditioning unit in the window of his room, which the State argued
at trial could have kept anyone from hearing what was transpiring in appellant's bedroom
on the nights in question. 

 In the confrontational phone calls, appellant appears to apologize and promise to
not sexually abuse B.A. again. In fact, appellant specifically states that "[i]t's over." 
Though the confrontational telephone calls do not conclusively establish that appellant
sexually abused B.A., they do corroborate B.A.'s testimony and allow the jury to make an
inference as to why: (1) appellant would apologize for and promise not to sexually abuse
B.A. again; (2) appellant would state that "[i]t's over," that it is his fault, and that it will never
happen again; and (3) appellant wanted B.A. to wait a year to discuss the incidents with
B.A. See Hooper, 214 S.W.3d at 13, 15-16 (holding that the jury, as the trier of fact, may
draw reasonable inferences from the facts and that the reviewing court must give
deference to such inferences). It was not incumbent upon the State to introduce any
doctor's reports or examination reports by treating physicians, as suggested by appellant, 
because circumstantial evidence alone may support a conviction and it is the cumulative
force of the evidence that guides our review. See id. at 13; Guevara, 152 S.W.3d at 49. 

 Appellant also alleged that B.A. and the police entrapped him, but this argument has
been inadequately briefed on appeal. See Tex. R. App. P. 38.1(h). With respect to
appellant's objections to the authenticity and credibility of the recordings of the
confrontational calls offered at trial, we conclude that appellant waived such objections by
not raising them first with the trial court. (6) See Tex. R. App. P. 33.1(a) (as a prerequisite to
presenting a complaint for appellate review, the record must show that the complaint was
first made to the trial court). 

 Based on the foregoing, we conclude that the jury was rationally justified in finding
guilt beyond a reasonable doubt and that the jury's verdict is not against the great weight
and preponderance of the evidence. See Watson, 204 S.W.3d at 414-15; Beckham, 29
S.W.3d at 151. Therefore, the evidence adduced at trial is legally and factually sufficient
to support appellant's convictions. Accordingly, we overrule appellant's sole issue.

IV. Conclusion


 We affirm the judgment of the trial court.


 

 DORI CONTRERAS GARZA,

 Justice


Do not publish. 

Tex. R. App. P. 47.2(b).

Memorandum Opinion delivered and 

filed this the 21st day of August, 2008. 





 
1. We do not detail Hutchins's testimony because it does not affect the disposition in this case. See
Tex. R. App. P. 47.1. 
2. The record does not contain any reports pertaining to any medical examination of B.A. when she
was taken to the emergency room. In fact, the record suggests that B.A. was only interviewed by law
enforcement authorities when she arrived at the emergency room.
3. B.A. testified that Amberly's Place is "a place where kids go when they have been raped or hurt .
. . ." Detective Segura later described Amberly's Place as a "multidisciplinary center . . . . It's a one-stop shop
for the investigations of crimes against children. The place you do--you do the interviews there. You can do
the medical exam. You get counseling, crisis intervention, things like that."
4. When asked what "crimes against children" are, Detective Segura responded that the description
included "[y]our molests [sic], sexual assaults, sexual abuse, touchings, things like that, also sometimes child
abuse, the physical abuse."
5. Section 21.11(c) of the penal code defines "sexual contact" as "any touching by a person, including
touching through clothing, of the anus, breast, or any part of the genitals of a child" or "any touching of any
part of the body of a child, including touching through clothing with the anus, breast, or any part of the genitals
of a person" if intended to "arouse or gratify the sexual desire of any person." Tex. Penal Code Ann. §
21.11(c) (Vernon 2003). The requisite specific intent to arouse or gratify the sexual desire of any person may
be inferred from a defendant's conduct, his remarks, and all surrounding circumstances. McKenzie v. State,
617 S.W.2d 211, 216 (Tex. Crim. App. [Panel Op.] 1981); see also Jimenez v. State, No. 04-06-00840-CR,
2007 Tex. App. LEXIS 5567, at *11 (Tex. App.-San Antonio July 18, 2007, no pet.). No oral expression of
intent, nor is visible evidence of sexual arousal required. See McKenzie, 617 S.W.2d at 216; see also Solis
v. State, No. 13-03-00262-CR, 2006 Tex. App. LEXIS 6216, at *5 (Tex. App.-Corpus Christi July 20, 2006,
no pet.).
6. Rule 1003 of the Texas Rules of Evidence authorizes the use of copies to the same extent as
originals unless one questions authenticity or demonstrates that it would be unfair to admit the duplicates. 
See Tex. R. Evid. 1003; see also Hood v. State, 944 S.W.2d 743, 747 (Tex. App.-Amarillo 1997, no pet.). 
However, appellant's trial counsel never objected to the admission of the recordings before they were
presented to the jury.