

**NUMBER 13-07-00563-CR**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI - EDINBURG**

---

**MARIO ALBERTO ADAIR,**                                        **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                        **Appellee.**

---

**On appeal from the 36th District Court
of San Patricio County, Texas.**

---

**MEMORANDUM OPINION**

**Before Justices Rodriguez, Garza, and Vela
Memorandum Opinion by Justice Garza**

Appellant, Mario Alberto Adair, was charged by indictment with three counts of indecency with a child, a second degree felony, and six counts of aggravated sexual assault, a first degree felony. *See* TEX. PENAL CODE ANN. § 21.11(a)(1), (d) (Vernon 2003), § 22.021(a)(1)(B), (e) (Vernon Supp. 2007). A jury convicted appellant on all nine counts contained in the indictment. Appellant elected for the trial court to assess his punishment.

He was subsequently sentenced to forty years' imprisonment for aggravated sexual assault and twenty years' imprisonment for indecency with a child. The trial court did not impose any fines and ordered the sentences to run concurrently. By one issue, appellant argues that the evidence adduced at trial was legally and factually insufficient to support his conviction. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On March 6, 2007, appellant was charged by indictment with three counts of indecency with a child and six counts of aggravated sexual assault. *See id.* §§ 21.11(a)(1), 22.021(a)(1)(B). The jury trial commenced on August 13, 2007. At trial, the State called five witnesses—B.A., the child victim, A.A., appellant's daughter, B.A.'s mother, Christian Segura, a detective for the Yuma Police Department in Arizona, and Steve Hutchins, a criminal investigator with the San Patricio County Sheriff's Office—while appellant did not call any witnesses.[1]

### a. B.A's Testimony

B.A. was fourteen years old at the time of trial and lived with her mother, sister, and brother, M.A.A., in Yuma, Arizona. While her family was living in Yuma, her mother and appellant got divorced. After the divorce, appellant moved to Ingleside, Texas. B.A. and her siblings would visit appellant in Ingleside during the summer and during Christmas breaks from school. The events in question transpired during a visit in the summer of 2005. While staying at appellant's house in Ingleside, she and her siblings would occasionally sleep in appellant's room. When asked about the events in question, B.A.

---

[1] We do not detail Hutchins's testimony because it does not affect the disposition in this case. *See* TEX. R. APP. P. 47.1.

testified to the following:

Q [the State]: I want to talk to you about some of the time—or I guess one time that you slept in your dad's bedroom.
Right when you got back from Arizona to Ingleside did your dad touch you inappropriately?

A [B.A.]: Not as soon as we got there.

Q: About how long was it from the time that you got there until the time he did that?

A: About a week later.

Q: And where did this take place in the house?

A: My dad's room.

Q: Was this daytime or nighttime?

A: Nighttime.

Q: What did your dad do to you?

A: He put his mouth on my private. He put his penis in my butt, he put his fingers in my private, and he put his mouth on my breast, and he put his fingers on my breast.

. . . .

Q: By private[,] what are you talking about?

A: My vagina.

B.A.'s brother and sister were in the room sleeping while the alleged offenses transpired. The room was dark. Appellant and her brother usually slept on appellant's queen-sized mattress while she and her sister slept on a mattress on the floor. B.A. was lying beside her sister when the alleged offenses happened, but appellant kept moving her away from her sister. B.A. testified that appellant sexually assaulted her again towards the end of the summer of 2005.

3

When asked about her outcry statement, B.A. stated that she did not tell anyone in Ingleside about the incidents because she was scared of getting hurt and ruining everyone's lives. Eventually, on August 22, 2005, B.A. confided in her mother after watching a movie on television about a girl who was molested and did not tell anyone about it. After telling her mother about the incidents, B.A. was taken to the emergency room.[2]

Later, B.A. met Detective Segura and gave him her statement at Amberly's Place.[3] Detective Segura then instructed B.A. to record telephone conversations with appellant in order to "make him admit what he did." Detective Segura assisted B.A. with recording one telephone conversation she had with appellant; however, appellant did not answer the phone on this occasion. B.A. later spoke with appellant over the phone on three different occasions, and she recorded each conversation. After making the recordings, B.A. turned them over to Detective Segura. B.A. further testified that the voices on the recordings were of her and appellant, and upon questioning by the State, B.A. indicated that she was not married to appellant.

On cross-examination, B.A. stated that she could not remember what she was wearing on the nights that the incidents occurred. She also noted that the mattress on which she and her sister slept was a regular mattress that was pulled off another bed in the house and that she and her sister shared a blanket while sleeping on the mattress. B.A.

---

[2] The record does not contain any reports pertaining to any medical examination of B.A. when she was taken to the emergency room. In fact, the record suggests that B.A. was only interviewed by law enforcement authorities when she arrived at the emergency room.

[3] B.A. testified that Amberly's Place is "a place where kids go when they have been raped or hurt . . . ." Detective Segura later described Amberly's Place as a "multidisciplinary center . . . . It's a one-stop shop for the investigations of crimes against children. The place you do—you do the interviews there. You can do the medical exam. You get counseling, crisis intervention, things like that."

admitted that the reason the children were sleeping in appellant's room was because the air conditioner in the house had stopped working. B.A. also admitted that appellant pulled her shorts down and pulled her shirt up halfway rather than fully removing all of her clothing while the alleged incidents took place. Finally, B.A. testified that when she recorded the conversations with appellant, her mother was in the room.

**b. Testimony of B.A.'s Mother**

After she and appellant separated in 2003, appellant moved back to Ingleside, where the family had resided previously. The couple's divorce was finalized in 2004. The couple agreed to a joint custody arrangement whereby appellant could come visit the children any time he liked. The arrangement also allowed for the children to visit appellant during the summer, Christmas, and sometimes spring break. During the summer of 2005, the children visited appellant in Ingleside from May until August. After returning to Arizona, B.A. called her while she was at work at approximately 8:00 p.m. on August 22, 2005, to inform her of the alleged incidents that had transpired at appellant's home in Ingleside. After she received the phone call from B.A., she left work and took B.A. to the emergency room. While at the hospital, B.A. spoke to several different police officers regarding the incidents. Later, Detective Segura came over to her house to interview her regarding B.A.'s allegations. Subsequently, B.A. was interviewed by police officers at Amberly's Place.

**c. A.A.'s Testimony**

A.A. currently lives with her mother, B.A., and M.A.A. in Yuma, Arizona. When the children would visit appellant during the summer and at Christmas, the children occasionally slept in appellant's bedroom. A.A. would take the mattress from her bed and

5

place it in appellant's bedroom. The mattress had pillows and blankets on it, and she and B.A. would sleep together on the mattress. They mostly slept in appellant's bedroom because the home air conditioning unit was broken. However, A.A. stated that appellant had purchased a "portable air condition thing that he put on his window" and that she remembered it being used only during the summer of 2005.

With respect to the nights in question, A.A. recalled one night where she woke up to find B.A. in appellant's bed. B.A. usually wore shorts and a t-shirt to bed while staying at appellant's home. A.A. testified that she had heard the recorded conversations made by B.A. and that the voices on the recording were that of B.A. and appellant.

On cross-examination, A.A. admitted that her dog Mini, a Chihuahua, often slept on the mattress with her and B.A. when they stayed at appellant's home. She did not recall Mini sleeping anywhere other than on the mattress with her and B.A while they stayed at appellant's home.

### d. Detective Segura's Testimony

Detective Segura has worked for the Yuma Police Department for twenty years with about 300 hours of training working "crimes against children."[4] Detective Segura has worked in "[c]lose to if not over a thousand [child sexual abuse] cases." Detective Segura described the interview process with the child victim and mentioned that during the course of an investigation, he tries to obtain corroborative evidence—DNA evidence, actual eyewitness accounts, or confrontational phone calls—to support the child victim's outcry statement. Detective Segura described a confrontational phone call as "a call where the

---

[4] When asked what "crimes against children" are, Detective Segura responded that the description included "[y]our molests [sic], sexual assaults, sexual abuse, touchings, things like that, also sometimes child abuse, the physical abuse."

victim makes a telephone call to the alleged person and then they basically get them to admit to what happened." He stressed that he gives the child victim explicit instructions regarding what to say when they are talking to the alleged perpetrator. He worked with B.A. to develop a theme for talking to appellant about the incidents. Detective Segura brought to court the microcassette recorder that B.A. had used to record her conversations with appellant. Detective Segura testified that while speaking to B.A. at Amberly's Place on August 25, 2005, she agreed to make a confrontational call to appellant.

B.A. made phone calls to appellant while Detective Segura was present, but no one answered those calls. Detective Segura then allowed B.A. to take the microcassette recorder home to record calls herself. Detective Segura received a phone call from B.A.'s mother a couple of days later indicating that they had recorded three phone calls with appellant. B.A. and her mother returned the microcassette recorder to Detective Segura when he visited them later the same day.

The State then offered to introduce the recordings of the confrontational calls into evidence. Detective Segura testified that: (1) he had listened to the tape; (2) no changes had been made to the tape since it was given to him by B.A. and her mother; and (3) the recording to be heard was a copy he had made for the State from the original given to him by B.A. and her mother. Appellant made no objections to the introduction of the recordings.

**e. The Recordings**

The State then introduced the recordings of the telephone conversations between B.A. and appellant into evidence. The recordings contained the following exchanges which are pertinent to our review:

7

[B.A.]: I know what you have been doing to me in the night.  I'm not mad.  I'm not going to tell any [sic] anyone or anything, but I know.

[Appellant:] Yeah, I'm listening.

[B.A.]: And like [sic] touch me in the private part because I don't like it.

[Appellant]: (Inaudible).

[B.A.]: So I want you to tell me you won't do it.  Hello?

[Appellant]: I'm—I'm listening.

. . . .

[B.A.]: Hey, dad, you know what we talked about?

[Appellant]: Yeah.

[B.A.]: I want you to like apologize.

[Appellant]: Yeah, hum, you know, this is something we need to talk about in person.

[B.A.]: No, dad.  I want you to apologize.  I want—because, dad, I really want you to apologize on the phone.  Nobody is here.

[Appellant]: Yeah, I apologize (inaudible).  I apologize for (inaudible).

[B.A.]: Like, promise.  I want you to promise out loud.

[Appellant]: I promise, I said it before (inaudible).

[B.A.]: Why did you do it anyway?

[Appellant]: Well, [B.A.], we can talk about this later on in person.

[B.A.]: Because I have been having bad dreams because I watched a movie.

[Appellant]: Yeah?

[B.A.]: And—yeah.

8

[Appellant]: Yeah. Well, the thing about it is (inaudible). Well, like I said, it's something we need to talk in person later on (inaudible) probably about a year from now (inaudible).

. . . .

[Appellant]: (Inaudible). Yeah, you know, about what you were saying earlier, I know you want some answers, need some answers but it's something very personal that I think that, you know (inaudible).

. . . .

[B.A.]: Dad, I don't want to see you if you're going to be touching my private again.

[Appellant]: What have I told you earlier, [B.A.]?

[B.A.]: Oh, I don't know.

[Appellant]: (Inaudible) I said it's over. It's over.

[B.A.]: You should have planned (inaudible) and I wouldn't be having to ask you all of these questions. It's not my fault it happened. It's yours.

[Appellant]: Yeah.

. . . .

[B.A.]: No, dad. I'm just saying I don't want it to happen to any more children because then you are going to get caught, and I don't want you in jail. So I want you to say it on the phone. I want you to say it [sic] I will never do it—I will never molest any other children or me again. Say it, or I will be so mad at you. You don't want—

[Appellant]: I've already told you. I said no, no, no.

[B.A.]: I want you to promise. I want you to say it. I want you to say I promise I won't do it again.

[Appellant]: I promise it will not happen again.

. . . .

9

[B.A.]:        I mean, do you want to tell mom?

[Appellant]:   No.

After the recordings were published to the jury, appellant objected, contending that the recordings were never properly entered into evidence.  However, the trial court denied his objection.

Appellant rested his case without calling any witnesses or presenting any evidence.  The jury subsequently convicted appellant on all nine counts contained in the indictment.  On September 10, 2007, the trial court sentenced him to forty years' imprisonment in the Texas Department of Criminal Justice-Institutional Division for the aggravated sexual assault conviction.  Appellant also received twenty years' confinement for the indecency with a child conviction.  The sentences were ordered to run concurrently.  On September 10, 2007, appellant timely filed his notice of appeal.  Also, on September 10, 2007, the trial court certified appellant's right to appeal.  This appeal ensued.

## II. STANDARD OF REVIEW

In a legal sufficiency review, we view the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Watson v. State*, 204 S.W.3d 404, 414-17 (Tex. Crim. App. 2006).  The trier of fact is the sole judge of the facts, the credibility of the witnesses, and the weight given to testimony.  *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Jackson*, 443 U.S. at 318-39; *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd).  We do not reevaluate the weight and credibility of the evidence, whether circumstantial or direct, nor do we substitute our own judgment for that of the trier of fact.

10

*Mosley v. State*, 141 S.W.3d 816, 821 (Tex. App.–Texarkana 2004, pet. ref'd); *Beckham*, 29 S.W.3d at 151. Instead, we consider whether the jury reached a rational decision. *Beckham*, 29 S.W.3d at 151.

In a legal sufficiency review, each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Barnes v. State*, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994); *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993); *Alexander v. State*, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987)). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor; circumstantial evidence alone can be sufficient to establish guilt. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). On appeal, both circumstantial and direct evidence cases are examined using the same standard of review. *Id.*

We measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). "Such a charge would accurately set out the law, would be authorized by the indictment, and would not unnecessarily increase the State's burden of proof." *Malik*, 953 S.W.2d at 240. The elements for indecency with a child are: (1) appellant intentionally and knowingly engaged in sexual contact with a child or caused the child to engage in sexual contact;[5] (2) the child was younger than seventeen years old; and (3) the child was not

---

[5] Section 21.11(c) of the penal code defines "sexual contact" as "any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child" or "any touching of any part of the body of a child, including touching through clothing with the anus, breast, or any part of the genitals of a person" if intended to "arouse or gratify the sexual desire of any person." TEX. PENAL CODE ANN. §

11

appellant's spouse. TEX. PENAL CODE ANN. § 21.11(a)(1). The elements for aggravated sexual assault are appellant intentionally and knowingly: (1) caused the penetration of the anus or sexual organ of a child by any means; or (2) caused the sexual organ of a child to contact or penetrate appellant's mouth, anus, or sexual organ. *Id.* § 22.021(a)(1)(B).

In a factual sufficiency review, we review the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust. *Watson*, 204 S.W.3d at 414-15. After considering all of the evidence in the record related to appellant's sufficiency challenge, we compare the evidence weighed by the jury that tends to prove the elemental fact in dispute with the evidence that tends to disprove it. *Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997) (en banc). This Court will not reverse the jury's verdict unless we can say with some objective basis in the record that the great weight and preponderance of the evidence contradicts the verdict. *Watson*, 204 S.W.3d at 415.

### III. ANALYSIS

By his sole issue on appeal, appellant contends that the evidence adduced at trial was legally and factually insufficient to support his convictions. We disagree.

In arguing that the evidence is legally and factually insufficient, appellant states that there was no physical evidence of sexual abuse, there was no corroborating testimony that these incidents actually occurred, and the jury was moved by emotion; therefore, its verdict

---

21.11(c) (Vernon 2003). The requisite specific intent to arouse or gratify the sexual desire of any person may be inferred from a defendant's conduct, his remarks, and all surrounding circumstances. *McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. [Panel Op.] 1981); *see also Jimenez v. State*, No. 04-06-00840-CR, 2007 Tex. App. LEXIS 5567, at *11 (Tex. App.–San Antonio July 18, 2007, no pet.). No oral expression of intent, nor is visible evidence of sexual arousal required. *See McKenzie*, 617 S.W.2d at 216; *see also Solis v. State*, No. 13-03-00262-CR, 2006 Tex. App. LEXIS 6216, at *5 (Tex. App.–Corpus Christi July 20, 2006, no pet.).

is against the great weight and preponderance of the evidence. Appellant further argues that the confrontational telephone calls made by B.A. do not contain an admission from appellant that he sexually assaulted B.A and that the police and B.A. tried to entrap him. Appellant also questions the authenticity and credibility of the recording presented at trial.

We begin by noting that the testimony of a child victim alone is sufficient to support a conviction for sexual abuse. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07(a), (b)(1) (Vernon 2005); *see also Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.–Dallas 2002, pet. ref'd); *Empty v. State*, 972 S.W.2d 194, 196 (Tex. App.–Dallas 1998, pet. ref'd); *Ruiz v. State*, 891 S.W.2d 302, 304 (Tex. App.–San Antonio 1994, pet. ref'd); *Karnes v. State*, 873 S.W.2d 92, 96 (Tex. App.–Dallas 1994, no pet.) (noting that a child victim's testimony alone is sufficient evidence of penetration to support a conviction for aggravated sexual assault); *Kimberlin v. State*, 877 S.W.2d 828, 831 (Tex. App.–Fort Worth 1994, pet ref'd). Therefore, because B.A. testified as to both incidents of sexual abuse, her testimony would be enough to support appellant's convictions without any corroboration.

In any event, the evidence adduced at trial satisfies the elements of each of the alleged criminal offenses. B.A. testified that appellant: (1) put his mouth on her vagina; (2) put his penis in her butt; (3) put his fingers in her vagina; and (4) put his mouth and fingers on her breasts. B.A. also testified that she was fourteen years old at the time she gave her testimony, thus establishing that she was under seventeen years of age when the incidents occurred. In addition, B.A. stated that she was not appellant's spouse. Moreover, after conducting several interviews with B.A. at her home and at Amberly's Place, Detective Segura, a detective who had worked on approximately 1,000 child sexual abuse cases, also concluded that B.A. had been sexually assaulted. A.A. testified that

13

appellant had an air conditioning unit in the window of his room, which the State argued at trial could have kept anyone from hearing what was transpiring in appellant's bedroom on the nights in question.

In the confrontational phone calls, appellant appears to apologize and promise to not sexually abuse B.A. again. In fact, appellant specifically states that "[i]t's over." Though the confrontational telephone calls do not conclusively establish that appellant sexually abused B.A., they do corroborate B.A.'s testimony and allow the jury to make an inference as to why: (1) appellant would apologize for and promise not to sexually abuse B.A. again; (2) appellant would state that "[i]t's over," that it is his fault, and that it will never happen again; and (3) appellant wanted B.A. to wait a year to discuss the incidents with B.A. *See Hooper*, 214 S.W.3d at 13, 15-16 (holding that the jury, as the trier of fact, may draw reasonable inferences from the facts and that the reviewing court must give deference to such inferences). It was not incumbent upon the State to introduce any doctor's reports or examination reports by treating physicians, as suggested by appellant, because circumstantial evidence alone may support a conviction and it is the cumulative force of the evidence that guides our review. *See id.* at 13; *Guevara*, 152 S.W.3d at 49.

Appellant also alleged that B.A. and the police entrapped him, but this argument has been inadequately briefed on appeal. *See* TEX. R. APP. P. 38.1(h). With respect to appellant's objections to the authenticity and credibility of the recordings of the confrontational calls offered at trial, we conclude that appellant waived such objections by not raising them first with the trial court.[6] *See* TEX. R. APP. P. 33.1(a) (as a prerequisite to

---

[6] Rule 1003 of the Texas Rules of Evidence authorizes the use of copies to the same extent as originals unless one questions authenticity or demonstrates that it would be unfair to admit the duplicates. *See* TEX. R. EVID. 1003; *see also Hood v. State*, 944 S.W.2d 743, 747 (Tex. App.–Amarillo 1997, no pet.). However, appellant's trial counsel never objected to the admission of the recordings before they were

14

presenting a complaint for appellate review, the record must show that the complaint was first made to the trial court).

Based on the foregoing, we conclude that the jury was rationally justified in finding guilt beyond a reasonable doubt and that the jury's verdict is not against the great weight and preponderance of the evidence. *See Watson*, 204 S.W.3d at 414-15; *Beckham*, 29 S.W.3d at 151. Therefore, the evidence adduced at trial is legally and factually sufficient to support appellant's convictions. Accordingly, we overrule appellant's sole issue.

## IV. CONCLUSION

We affirm the judgment of the trial court.

DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).
Memorandum Opinion delivered and
filed this the 21st day of August, 2008.

---

presented to the jury.

15