NO. 07-07-0241-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

JANUARY 7, 2009
_____________________________

DON D. JOHNSON, ET AL.

                                                                                      Appellants

v.

LA MESA FARMS, INC., 

                                                                                      Appellee
_________________________________

FROM THE 121st DISTRICT COURT OF YOAKUM COUNTY;

NO. 8390; HON. KELLY G. MOORE, PRESIDING
_______________________________
 
Memorandum Opinion
________________________________

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.
          Don D. Johnson, et al. (Johnson) appeals from a judgment rendered in favor of La
Mesa Farms, Inc. (La Mesa) wherein a sheriff’s sale was ordered on a certain tract of real
estate. Via four issues, he contends that the 1) trial court failed to apply the correct legal
standard and correctly balance the equities of the co-tenants, 2) evidence was legally and
factually insufficient to support the finding that the subject property was not susceptible to
partition or that a fair and equitable division could not be made and 3) trial court incorrectly
balanced the equities of all of the co-tenants. We affirm.
Background
          This appeal involves a forced sale of a 162 acre tract of land located in Yoakum
County, Texas.


 In La Mesa’s petition, it alleged that the property was “partially non-farmable pasture and partially land capable of being farmed.” Furthermore, the “land [was]
incapable of being partitioned in equal shares among the various owners, and the land
[was] not capable of division in kind.” In all, 29 co-tenants owned interests ranging from
23.2222% to 2.6666%. La Mesa claimed to be a fee simple owner of 23.2222% undivided
interest in the land. 
          At trial, the parties stipulated to the identity of the property owners and their
respective percentages of ownership. So too did Lynn David Guetersloh testify as
president of La Mesa. He stated, among other things, the following: 1) there were no
improvements on the subject property, 2) the land was “raw native, pasture,” 3) the majority
of the top soil was made of sand, 4) La Mesa owned a 23.2222% interest in the property,
5) the interest was purchased with the idea of using an irrigation pivot system to water the
land, 6) he had to remove the mesquite and level the land so that the system could pass
over the land, 7) he undertook extensive labor to modify the property, 8) two things
precipitated the forced sale, those being Johnson’s re-negotiating a lease with La Mesa for
more money and the possibility that other co-tenants would come forward demanding the
same amount which in his view was unreasonable, 9) the property was comprised of 162.5
acres, 10) he cleared and cultivated approximately 130 acres, 11) some acreage within the
tract was of no value to anyone, 12) the land lacked public access, 13) the land was not
good for grazing cattle, 14) the property’s surface consisted of “high clay hills to sandy low
spots even down into some darker soil on portions of it,” 15) the value of the land would
be approximately $125 per acre, 16) with modifications the property would be valued at
$250 - $275 per acre, 17) the total fair market value of the property was $40,000, 18) he
did not believe that the tract could be divided equally, and 19) if it was divided the division
would immensely impair the land’s value. 
          On cross examination, Guetersloh admitted that 1) La Mesa only started farming the
land so that it could complete the circle with the pivot system being used, 2) he never
contacted the other co-tenants to negotiate leases with them, 3) La Mesa participated in
the USDA Farm Service Agency farm programs and received payments from the
government which it kept, and 4) La Mesa predominantly wanted the land for access and
for the half mile pivot system.
          The defense called Ronita de Cordova Miller (Miller) who testified that 1) the
property was Relinquishment Act land, 2) the land “should all stay together, that we
oversee it and make sure that it is used for the best benefit of the State of Texas as well
as ourselves,” 3) that neither she nor her relatives desired a forced sale of the land, 4) she
believed La Mesa could partition its portion and leave the rest of the property intact, and
5) the State would receive the royalties arising from mineral development. Yet, other
evidence revealed that the mineral deposits were not equally dispersed throughout the
subsurface. Also, little to none were located under the portion of land covered by La
Mesa’s sprinkler system, i.e. the portion of the land its opponents suggested that it receive
via a partition in kind.
          Doug Laufer also testified on behalf of the defense and stated that 1) he was
presently an independent landman involved in oil and gas exploration, 2) Relinquishment
Act land involved the State’s sale of the surface estate while retaining the mineral interests,
3) according to the Relinquishment Act, the surface owner had the duty to act as the agent
for the State in leasing the minerals and negotiating not only the bonus but the terms of the
oil and gas lease provided that they use the general land office form of lease which
contained many provisions associated with leasing minerals, 4) a dry well was drilled in
1965, 5) Transglobal leased a majority of the property for mineral exploration and a well
had been drilled 562 feet south of the subject property, 6) based upon documentation filed
by Transglobal, it “believe[d] they’re going to produce hydrocarbons,” 7) this investment
would affect the value of the subject property, 8) the land was worth around $152 per acre,
and 9) an equal division of the property would not affect its overall value. On cross
examination, he agreed that 1) five dry holes had been drilled in close proximity to the
subject property, 2) a possibility existed that dividing the property into equal parts could
render some parts more valuable than others, and 3) the documents filed by Transglobal
did not mean that they would be drilling on the subject property.
          The next defense witness was Sam Middleton (Middleton) who testified that 1) he
had been in the farm and ranch real estate and appraisal business for approximately 37
years, 2) the subject property was “sandy land, highly erodible type land,” 3) the best use
of the land would be to continue the leasing of minerals, 4) Guetersloh could sign a lease
with the landowners, be given an easement to use his sprinkler system on the land, or
partition out his interest, and 5) the property could be partitioned in a fair and equitable
manner. 
          After the foregoing witnesses testified, both parties rested and closed. The trial
court ultimately rendered judgment on March 28, 2007, and found that “a fair and equitable
division of the [property] . . . [could not] be made, and that [the] property should be
sold . . . .” It further concluded that 1) “[t]he share or interests of each of the joint-owners
or claimants in the real estate that is the subject of this suit [was] as set out on Exhibit ‘A,’
which” exhibit was attached and incorporated into the judgment, 2) “[n]o party [was] entitled
to reimbursement and/or offset against any other party arising out of legal and/or equitable
arguments,” 3) “[n]either the property nor any part thereof [was] susceptible of partition,”
and 4) “[a] fair and equitable division of the real estate [could not] be made.” It then
ordered that the “entire property . . . be sold,” and that the “proceeds of the sale . . . be
returned to the court to be partitioned among the persons entitled thereto.” Johnson
appealed that decision. 
Issue One - Incorrect Legal Standard
          Johnson contends in his first issue that the trial court applied an incorrect legal
standard when determining that the property was not susceptible to partition in kind. That
is, it used the “shattering” test which test was manifestly wrong and contrary to Texas law. 
Furthermore, the law purportedly favored partition in kind over a forced sale. The facts
upon which it based the argument were that 1) La Mesa was the only co-tenant who
wanted partition and a forced sale, 2) 65% of the owners did not want the forced sale, and
3) the segregating test for partition was the correct standard, that is, the trial court should
have segregated La Mesa’s 23.2222% interest (or 37.6 acres) from the other land even
though the land to be segregated had no minerals underneath it while other parts of the
tract did. We overrule the issue.
          Applicable Law
          That a co-tenant has an absolute right to partition is beyond dispute. Beago v.
Ceres, 619 S.W.2d 293, 295 (Tex. Civ. App.–Houston [1st Dist.] 1981, no writ). The
dispute, however, usually involves the manner in which partition should be effectuated. 
According to Texas Rule of Civil Procedure 770 which governs the forced sale of land, if 
. . . the court be of the opinion that a fair and equitable division of the real
estate, or any part thereof, cannot be made, it shall order a sale of so much 
as is incapable of partition, which sale shall be for cash, or upon such other
terms as the court may direct, and shall be made as under execution or by
private or public sale through a receiver, if the court so order, and the proceeds thereof shall be returned into court and be partitioned among the
persons entitled thereto, according to their respective interests.

Tex. R. Civ. P. 770. Furthermore, whether such a fair partition can be had is a question of
fact for the factfinder to decide. Cecola v. Ruley, 12 S.W.3d 848, 853 (Tex. App.–
Texarkana 2000, no pet.). Next, since the law favors partition in kind over partition by sale,
the burden of proof falls upon the party seeking a forced sale to justify it. Id. If the
proponent carries his burden and establishes that the property is not susceptible to
partition in kind, there must be a partition by sale. We finally note that §23.001 of the
Texas Property Code allows a joint owner or claimant of real property or an interest in real
property or a joint owner of personal property to compel a partition of the interest or the
property among the joint owners or claimants under this chapter and the Texas Rules of
Civil Procedure. Tex. Prop. Code §23.001 (Vernon 2007). 
          Analysis
          Review of the statutes and rule mentioned above disclose that even though the law
may favor a partition in kind, partition may nonetheless occur through a forced sale of the
entire property. Which option to apply is simply dependent upon the evidence presented
at trial, despite the respective desires of the parties. Furthermore, neither statute nor rule
of procedure requires that a majority of the joint owners acquiesce in or petition for the
sale. 
          Second, and to the extent that Johnson believed the “segregating standard” was the
correct method for partitioning the property, Rule 770 indicates otherwise. Again, it
provides for the sale of so much of the tract the trial court deems necessary if “the court
be of the opinion that a fair and equitable division of the real estate, or any part thereof,
cannot be made . . . .” Tex. R. Civ. P. 770. Therefore, Johnson was mistaken in
suggesting that the law precluded “shattering” of the land. 
           Issues Two, Three, and Four - Insufficient Evidence/Did Not Assess Equities
          We consider the last three issues together since they are interrelated. Through
them, Johnson contends that the evidence was legally and factually insufficient to support
the finding that the property 1) was not susceptible of partition and 2) could not be equally
and fairly divided. So too does he argue that the trial court failed to balance and consider
“all equities between the co-tenants.” We overrule each issue.
          Applicable Law
          When the record contains conflicting evidence regarding the susceptibility of
partitioning land in a particular way, the manner of partitioning is for the jury or trier of fact
to determine. Rayson v. Johns, 524 S.W.2d 380, 382 (Tex. Civ. App.–Texarkana 1975,
writ ref’d n.r.e.); see also White v. Smyth, 147 Tex 272, 214 S.W.2d 953, 960 (1948)
(finding that evidence was sufficient to raise issues of fact and to support jury's finding
regarding the land’s susceptibility to partitioning). Consequently, we cannot simply
substitute our judgment for that of the factfinder.
          According to the record, Guetersloh acquired his interest in the land via a tax sale. 
When purchased, the realty was “raw native, pasture” composed in large part of sand. 
Nonetheless, he bought it so that a pivot sprinkler system that had already been installed
on adjacent lands he farmed could make a complete rotation without having to back up. 
Moreover, while sectors of the property could be improved for farming others could not. 
So, each acre was not necessarily like every other acre. Consequently, Guetersloh
testified that the land could not be divided equally without impairing its value given the lack
of uniformity in land quality. 
          Next, other evidence indicated not only that various dry wells had been drilled
around the property but also that one well on the property which had produced minerals
was plugged a number of years ago. Data also revealed that to the extent minerals may
exist under the surface, they too were not spread uniformly throughout the tract. So,
dividing it into parcels would result in some surface owners being excluded from the
benefits of mineral production. Furthermore, one such parcel of land was the acreage
adjoining Guetersloh’s other property. Johnson quite candidly argued that since
Guetersloh wanted that land to facilitate his farming efforts, that is the land he should
receive. Such a result would leave the remainder intact for the others to enjoy. That the
result would effectively deprive Guetersloh of also profiting from the underlying minerals
appeared to be of little concern to Johnson and his colleagues. As stated in their brief,
“neither the courts nor the co-tenants have a duty to protect La Mesa from itself.” This,
however, seems at odds with Johnson’s general theory that the trial court should have
considered the equities of all involved. One could legitimately question as equitable the
proposition that Johnson and his group retain lands which they deemed valuable while
giving La Mesa property which they believed had little value. So, despite the contention
that the trial court was not obligated to protect La Mesa “from itself,” the court remained
free to consider all the equities involved irrespective of the parties’ contentions. And, by
ordering that the land be sold and the proceeds distributed was a reasonable means of
allowing all to reap whatever benefit may arise from the presence of minerals under the
tract. Simply put, the potential for mineral development and acting as agent for the State
could be factored into the sale price. Additionally, no one has referred us to any legal
impediment barring Johnson and his colleagues from bidding and buying the land at the
sale. So, in ordering that the land be sold and proceeds distributed, it could be said that
the trial court struck a balance that affected all in the same way, and we hesitate to say
that the potential for being treated equally is inequitable. 
          In short, there was and is more than a scintilla of evidence supporting the trial
court’s findings. And, given the tenor of the record we cannot say that the resolution struck
by the court was so against the great weight and preponderance of the evidence as to
evince a manifestly erroneous or unjust result. Nor can we say that the factfinder
neglected to consider and balance the equities of all involved.           
          The judgment of the trial court is affirmed. 
 
                                                                           Brian Quinn
                                                                          Chief Justice



="text-align: justify; line-height: 0.416667in; margin-bottom: 0.104167in">          “Penetration may be proven by circumstantial evidence;” Nilsson v. State, 477
S.W.2d 592, 595 (Tex.Crim.App. 1972), and there is no requirement that the victim be able
to testify as to penetration. Villalon, 791 S.W.2d at 133; Nilsson, 477 S.W.2d at 596. See
Mosley v. State, 141 S.W.3d 816, 823 (Tex.App.–Texarkana 2004, pet. ref’d). Neither is
medical evidence necessary to prove penetration. Villalon, 791 S.W.2d at 133. 
          Relying on these principles, we find the evidence sufficient to establish penetration. 
Amanda testified Appellant touched her “in the wrong way” or “in my middle.” She
explained that by “the middle part,” she meant her “private part,” and agreed with the
prosecutor that you go to the bathroom and pee with your “private part.” She then agreed
with the prosecutor that Appellant put his private part in her private part and “[i]t hurt.” 
Amanda’s aunt testified that, during her outcry, Amanda told her Appellant raped her,
pinned her down, and “stuck his penis inside her where her menstrual cycles come from.”
Finally, Salazar, the sexual assault nurse examiner that examined Amanda, testified that
Amanda’s genitalia showed scarring which evidenced a penetrating injury or actual tear
caused by trauma to her private part. She further testified that, although the scarring was
not conclusive evidence of sexual assault, the penetrating injury was consistent with
Amanda’s history of sexual assault. 
          The totality of the evidence, here, was sufficient for a rational trier of fact to have
believed that the element of penetration of the child victim’s sexual organ was established
beyond a reasonable doubt. 791 S.W.2d at 133-34. See Mosley, 141 S.W.3d at 823.
          B.       Factual Sufficiency
                     1.       Standard of Review
          When conducting a factual sufficiency review, we examine all the evidence in a
neutral light and determine whether the trier of fact was rationally justified in finding guilt
beyond a reasonable doubt. Roberts v. State, 220 S.W.3d 521, 524 (Tex.Crim.App. 2007),
cert. denied, 128 S.Ct. 282, 169 L.Ed.2d 206, 76 U.S.L.W. 3165 (2007); Watson v. State,
204 S.W.3d 404, 415 (Tex.Crim.App. 2006). We give deference to the fact finder’s
determination when supported by the record, and cannot reverse a conviction unless we
find some objective basis in the record demonstrating that the great weight and
preponderance of the evidence contradicts the verdict. Watson, 204 S.W.3d at 417. The
criminal verdict will be set aside “only if the evidence is so weak that the verdict is clearly
wrong and manifestly unjust, or the contrary evidence so strong that the standard of proof
beyond a reasonable doubt could not have been met.” Gaza v. State, 213 S.W.3d 338,
343 (Tex.Crim.App. 2007). In addition, the fact finder is entitled to judge the credibility of
the witnesses and may choose to believe all, or some or none of the testimony presented. 
Chambers v. State, 805 S.W.2d 459, 461 (Tex.Crim.App. 1991). 
                     2.       Analysis – Aggravated Sexual Assault
          Appellant contends the evidence is factually insufficient because Salazar could not
testify with certainty that Amanda’s penetration injury was caused by a male sexual organ
or more precisely determine when the injury occurred. Nevertheless, Salazar did testify
a male sexual organ could have caused the injury and the penetration injury was consistent
with Amanda’s history of sexual abuse. 
          Our evaluation of the evidence “should not substantially intrude upon the jury’s role
as the sole judge of the weight and credibility of testimony” such as Salazar’s. Jones v.
State, 944 S.W.2d 642, 648 (Tex.Crim.App. 1996), cert. denied, 522 U.S. 832, 118 S.Ct.
100, 139 L.Ed.2d 54 (1997). To the extent Appellant claims the evidence is factually
insufficient because Salazar’s opinions were less than certain, we hold that the evidence
in support of the jury’s verdict was not so weak as to render the verdict clearly wrong or
manifestly unjust. Appellant’s first issue is overruled.
          II.       Ineffective Assistance of Counsel
          Appellant’s second and third issues assert he was denied ineffective assistance of
counsel. His fourth issue asserts that the cumulative effect of the errors asserted in issues
two and three severely prejudiced him and, for this reason, he was denied effective
assistance of counsel. For convenience, we will consider these issues together. 
           A.       Standard of Review
          We examine ineffective assistance of counsel claims by the standard enunciated 
in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984),
and adopted by Texas in Hernandez v. State, 726 S.W.2d 53, 56-57 (Tex.Crim.App. 1986). 
Appellant has the burden to show by a preponderance of evidence (1) trial counsel’s
performance was deficient in that it fell below the prevailing professional norms, and (2)
the deficiency prejudiced the defendant; that is, but for the deficiency, there is a reasonable
probability that the result of the proceeding would have been different. See Thompson v.
State, 9 S.W.3d 808, 812 (Tex.Crim.App. 1999). We examine the totality of counsel’s
representation to determine whether Appellant received effective assistance but do not
judge counsel’s strategic decisions in hindsight. Id. at 813. Rather, counsel’s conduct is
viewed with great deference. Goodspeed v. State, 187 S.W.3d 390, 392 (Tex.Crim.App.
2005). Any allegation of ineffectiveness must be firmly founded in the record, and the
record must affirmatively demonstrate the alleged ineffectiveness. Thompson, 9 S.W.3d
at 812. 
          In the usual case in which an ineffective assistance claim is made, “the record on
direct appeal will not be sufficient to show that counsel’s representation was so deficient
and so lacking in tactical or strategic decision-making as to overcome the presumption that
counsel’s conduct was reasonable and professional.” Bone v. State, 77 S.W.3d 828, 833
(Tex.Crim.App. 2002). This is generally the case because a silent record provides no
explanation for counsel’s actions and therefore will not overcome the strong presumption
of reasonable assistance. Freeman v. State, 125 S.W.3d 505, 506 (Tex.Crim.App. 2003);
Rylander v. State, 101 S.W.3d 107, 110-11 (Tex.Crim.App. 2003).



          B.       Outcry Statement – Issue Two
          Appellant first asserts counsel was ineffective because he failed to object to
testimony of Amanda’s outcry statement by her aunt. Appellant contends that an objection
was proper because her aunt was not the first person to whom Amanda made an outcry
statement. Appellant contends Amanda made her first outcry statement to her mother,
Diana. 
          Article 38.072 of the Code of Criminal Procedure permits outcry statements by
victims of child abuse to be admitted during trial, despite the hearsay rule, if the statement
was made by the child against whom the offense was allegedly committed and the
statement was made to the first person to whom the child made the statement about the
offense. See Tex. Code Crim. Proc. Ann. art. 38.072 § 1 (1), § 2 (1) & (2) (Vernon 2005). 
To qualify as proper outcry statements, the child must have described the alleged offense
in some discernible way and must have more than generally insinuated that sexual abuse
occurred. Garcia v. State, 792 S.W.2d 88, 91 (Tex.Crim.App. 1990). See Sims v. State,
12 S.W.3d 499, 500 (Tex.App.–Dallas 1999, pet. ref’d); Hayden v. State, 928 S.W.2d 229,
231 (Tex.App.–Houston [14th Dist.] 1996, pet. ref’d). 
          The Sims court held the trial court did not abuse its discretion by holding a Family
Services employee, and not a child victim’s mother, was the proper outcry witness. 12
S.W.3d at 500. The appellant in Sims contended the mother should have been the proper
outcry witness because the child initially told her mother that appellant “had touched her
private parts.” Id. Subsequent to the statement made to the mother, the child made a
statement to a Family Services employee that provided specific details establishing the
elements of the charged offense (indecency with a child). Id. Because the record failed
to show that the child provided a clear description of the charged offense to her mother,
as required by article 38.072, the Sims court held that it was reasonable for the trial court
to determine the statement made by the child to the Family Services employee met the
requirements of article 38.072. Id. 
          Here, as in Sims, the record establishes that Amanda made a statement to her aunt
that provided specific details establishing the elements of the charged offense. The record
also establishes that any outcry statement made by Amanda to her mother was related to
physical abuse or, at most, inappropriate touching of a sexual nature. Thus, under Sims,
an objection to Amanda’s aunt’s testimony was not in order. The law as applied to the
facts of this case indicate that the performance of Appellant’s counsel was not deficient
and did not fall below prevailing professional norms. Appellant’s second issue fails to
satisfy the first element of an ineffective counsel claim and is overruled.
          C.       Extraneous Offenses - Issue Three 
          Appellant next complains that his counsel was ineffective because he did not object
to the State’s evidence of extraneous offenses. Specifically, Appellant contends witnesses’
testimony that he physically abused the children and threatened them was inadmissible
under Rule 404(b) of the Rules of Evidence and a proper objection would have resulted
in the testimony being excluded. 
          Here, not only did the State solicit testimony as to these extraneous offenses but
Appellant’s counsel also solicited such testimony in his direct examination of witnesses in
order to impeach their credibility and emphasize inconsistencies in their prior statements. 
Here, the record is silent as to whether trial counsel’s failure to object to the extraneous
offenses was a matter of trial strategy, and if so, whether the strategy was sound. Failure
to make the required showing of deficient performance defeats Appellant’s ineffectiveness
claim. Thompson v. State, 9 S.W.3d 808, 814 (Tex.Crim.App. 1999). Moreover, where
counsel not only fails to object but elicits the very testimony Appellant finds objectionable,
“[w]e decline to hold that such actions which waive evidentiary grounds may automatically
be transformed into grounds for relief for ineffective assistance of counsel.” Ex parte
Ewing, 570 S.W.2d 941, 948 (Tex.Crim.App. 1978). Appellant’s third issue is overruled. 
Because we have overruled issues two and three, Appellant’s fourth issue regarding
cumulative error is pretermitted
.                                                         Conclusion
 
          The trial court’s judgment is affirmed. 
          
 
                                                                           Patrick A. Pirtle 

                                                                                  Justice 



Do not publish.